**UNITED STATES of America,**

v.

**Charles T. MAUDE, Appellant.**

**No. 23741.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1970.

Decided May 24, 1973.

Barry Smoler, Washington, D. C., with whom George F. Trowbridge, Washington, D. C. (both appointed by this Court), was on the brief, for appellant.

Philip L. Cohan, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, Asst. U. S. Atty., and Robert S. Bennett, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before McGOWAN and ROBINSON, Circuit Judges, and CHRISTENSEN,* Senior United States District Judge, District of Utah.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal has brought before us appellant's conviction, by a jury, of violations of 18 U.S.C. § 503[1] asserted in a two-count indictment. One of the counts charged the forging and counterfeiting of a postmarking stamp;[2] the other charged the knowing possession of the stamp with intent to use it.[3] Appellant attacks the conviction on a number of grounds, which have been ably advanced by his counsel.[4] We have exam-

---

* Sitting by designation pursuant to 28 U. S.C. § 294(d) (1970).

1. That section provides:
   Whoever forges or counterfeits any postmarking stamp, or impression thereof with intent to make it appear that such impression is a genuine postmark, or makes or knowingly uses or sells, or possesses with intent to use or sell, any forged or counterfeited postmarking stamp, die, plate or engraving, or such impression thereof, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. See note 1, *supra.*

3. See note 1, *supra.*

4. The principal contentions, and the divisions of this opinion wherein they are discussed, are that the stamp in question was not a postmarking stamp within the meaning of § 503 (Part II); that § 503, if extended to cover the stamp involved, becomes unconstitutionally vague (Part

ined each contention with care and, finding no error warranting reversal, we have affirmed.[5]

**I**

The events underlying the conviction were established by the Government's uncontradicted evidence at appellant's trial.[6] Appellant entered the office of the Hay Rubber Stamp Company[7] and, in the name "Robert M. Dix," placed an order for a stamp and a set of dates. By appellant's specifications, the stamp was to make an impression consisting in two concentric circles, the inscription "Greenville, N. C." between the circles, and a date inside the smaller circle. In design and dimensions, the stamp invoiced was identical to an all-purpose dating stamp commonly used in post offices.[8]

The Hay Company had previously been requested by postal authorities to maintain an outlook, for orders of stamps of that kind, with which money orders were being counterfeited.[9] Since appellant displayed no evidence of authority to procure the stamp on behalf of the Post Office Department, Hay promptly notified Inspector Alexander McRae, and was instructed to make the stamp as directed. Four days later, Rufus F. Bryant called at Hay for "the order for Mr. Dix," displayed a copy of

the invoice, and Hay delivered the stamp and dates to him. Bryant then walked to a parked car in which appellant was seated, and both Bryant and appellant were immediately arrested.[10]

An on-scene search of appellant uncovered a piece of paper on which appeared Hay's name, address and telephone number, and a rough sketch seemingly depicting the face of a circular stamp. Later that day, Inspector McRae obtained a warrant to search appellant's apartment for money orders recently stolen from a post office.[11] The search yielded no money orders, but did turn up identification cards bearing the name "Roger M. Dix." [12] Inspector McRae, noting the similarity of that name to the name given when the stamp was ordered,[13] seized the cards and, over appellant's objection, the Government introduced them into evidence at trial. The real Roger M. Dix testified that he did not know appellant or how he got the cards. He added that they had been missing about six months, and that he had not given them to appellant or anyone else.

The stamp ordered by appellant— GX–3, as it was marked as an exhibit at trial—was fabricated as appellant directed. It bears repeating that, used with standardized dates, it made an impression consisting in two concentric cir-

III) ; that evidence seized upon a search of appellant's apartment, but not mentioned in the warrant authorizing the search, was erroneously received at his trial (Part IV) ; that specific-intent elements required by § 503 were not proven (Part V) ; that the trial judge erred in refusing to define the term "postmarking stamp" in her instructions to the jury (Part VI) ; and that § 503 does not tolerate simultaneous conviction on both counts of the indictment (Part VII).

5. After carefully considering appellant's arguments in light of a thorough canvass of the record, we concluded that his conviction must be affirmed and entered our judgment accordingly. We noted that this opinion would follow as promptly as the business of the court permitted.

6. See note 19, *infra,* and accompanying text.

7. Appellant was accompanied by another person, who was not identified at trial.

8. See text *infra* at notes 15–18.

9. That is, stamped to create the impression of genuineness.

10. Appellant and Bryant were jointly indicted on the theory that they were confederates. The cases were severed for trial.

11. See text *supra* at note 9.

12. These included Dix' social security card, driver's license and military discharge.

13. As already stated, the order for the stamp was placed in the name of *"Robert M. Dix,"* while the name on the identification cards was *"Roger M. Dix."*

cles with "Greenville, N.C." between the circles and a date inside the inner circle; and that, as so made, it was an exact duplicate of an all-purpose stamp which sees general service in post offices. Testimony at the trial dealt extensively with the nature and frequency of the functions which its genuine counterpart performed, and differences in the functioning of other stamps.[14]

The Post Office Department has adopted a variety of stamps for postmarking and other purposes. Most post offices postmark first-class mail with a stamped impression containing a single circle, the initials "U.S.P.O.," and straight or wavy lines which cancel the postage stamps attached. The impression made by the all-purpose stamp, on the other hand, sometimes lacks the designation "U.S.P.O." [15] and always omits the lines. That stamp is used principally to validate money orders and mail receipts, but it is also used in postmarking. The all-purpose stamp is regularly employed in postmarking registered and certified mail,[16] and in smaller post offices also to postmark first-class mail.[17] A third to a fourth of the post offices in the United States use stamps which do not have the legend "U.S.P.O.," [18] and some post offices have only one type of stamp—the all-purpose model.

At appellant's trial, the Government presented five witnesses and twelve exhibits. The defense tendered four exhibits, two of which were admitted,[19] but presented no witnesses. The jury found appellant guilty on both counts, and the judge imposed a general sentence of imprisonment for twenty months to five years.

## II

Each of the two counts on which appellant was convicted charged activities involving a forged or counterfeited "postmarking stamp." Appellant first contends that these words, as used in Section 503,[20] the underlying statute, refer to objects devoted by the Post Office Department solely to the cancellation of postage stamps on mail matter. Since most post offices cancel first-class mail with a different type of stamp,[21] and since the all-purpose stamp which GX–3 simulates is more generally employed in operations other than postmarking,[22] appellant argues that GX–3, the stamp fabricated on his order, falls outside the ambit of the statute.

Section 503 does not define "postmarking stamp," nor is a definition contained elsewhere in postal legislation. We think, however, that the meaning of the term is clear enough. It is common-

14. The occasion therefor was a burning issue as to whether GX–3 was a postmarking stamp within the meaning of § 503.

15. That is because only in recent years has the legend "U.S.P.O." been adopted by the Post Office Department.

16. Cancellation of postage stamps on registered and certified mail, as distinguished from the postmarking itself, involves use of a separate stamp.

17. The reason is that some smaller post offices have only the all-purpose stamp, which of necessity they must use in all stamping operations.

18. See note 15, *supra*.

19. These were a postal money order issued to appellant's trial counsel (not his counsel on appeal)—to show the validating

stamp—and the postmarked envelope of a letter from appellant to trial counsel—to show the postmark.

20. Quoted *supra* note 1.

21. As we have said, see text *supra* following note 14, a majority of post offices use another stamp for canceling first-class mail—one which contains the initials "U.S.P.O.," and straight or wavy lines for canceling stamps in the postmarking operation. GX–3, which contains neither the initials nor the lines, is used primarily to validate money orders. Appellant's logic is that the adjective "postmarking" was not intended to include the process of validating money orders, and thus that the production of a stamp like GX–3 does not violate Section 503.

22. See notes 15–18, *supra*.

ly known that a postmark is the official mark which the Post Office Department places on mail,[23] and a stamp regularly used to impress that mark is obviously a postmarking stamp. That understanding is thoroughly consistent with the language of Section 503, and it finds solid support in its legislative history.[24] Whatever else the term "postmarking stamp" may embrace,[25] we are satisfied that it intercepts at least that much.[26]

■ This does not mean, however, that only those stamps which are used exclusively for marking mail, and which are put to that use in all post offices, are postmarking stamps within the meaning of Section 503. Nothing in the statutory language or legislative history suggests that narrow construction; on the contrary, the evident legislative purpose negates such limitations. The congressional concern was the ease with which false postmarkings could be and were being made,[27] and the "increasing necessity" of curbing them.[28] That objective hardly leaves room for differentiating postmarking devices according to the number of post offices in which

23. A "postmark" is "an official postal marking on a piece of mail, specifically: a mark showing the name of the post office and the date and sometimes the hour of mailing and often serving as the actual and only cancelation." Webster's Third New International Dictionary at 1772–73 (1964). See also Severs v. Abrahamson, 255 Iowa 979, 124 N.W.2d 150, 152 (1963); Application of George, 185 Misc. 671, 57 N.Y.S.2d 494, 496 (Sup.Ct.1945).

24. C. L. Williams, Superintendent of the Division of Post Office Inspectors, the only witness at a hearing conducted by the House Committee on the Post Office and Post Roads, described the need for the legislation as follows:

The Post Office Department has had a great deal of trouble in the past few years with forged postmarks. The postmarking stamps that a postmaster uses for cancellation of stamps on letters is a very simple device and very easily made, and the postmark on a letter has considerable legal significance under certain circumstances. For example, payment of a premium on a life-insurance policy, if it is not in the mails on a certain date, the policy becomes void. Also income-tax returns is another thing.

It is such a simple thing to do, and there is so much that depends on the validity and bona fides of a postmarking stamp, that we think there should be some punishment for counterfeiting a postmarking stamp.

There is another angle to the same proposition: The last few years have seen an increasing interest in philatelic matters, placing cachets and various indicia on the envelopes of mail matter for the purpose of giving it philatelic value. And it is likewise a very simple matter to counterfeit those cachets, so that it is difficult to distinguish the imitation from the genuine.

Those are the two points which the Department hopes to cover in this bill. Hearings on H.R. 5049 Before the House Comm. on the Post Office and Post Roads, 74th Cong., 1st Sess. 29 (1935). The Committee, in turn, explained:

At present there is no law providing punishment for forging or counterfeiting postmarking stamps and an increasing necessity therefor has been demonstrated in the experience of the Department. Hearings were held by your committee at which representatives of the Post Office Department pointed out the need of safeguarding the postmarking stamps used by postmasters in canceling stamps on letters, which have considerable legal significance under certain circumstances. Attention was also called to the increasing interest in philatelic matters and the importance attached to cachets on envelopes, the committee being informed that it is a simple matter to counterfeit the cachets and difficult to distinguish the imitation from the genuine.

H.R.Rep.No.580, 74th Cong., 1st Sess. 1 (1935). See, to the same effect, S.Rep. No.1438, 74th Cong., 1st Sess. 1 (1935).

25. We intimate no opinion in this regard.

26. In this view, and the further view that GX–3 is a "post-marking stamp" because it does service in postmarking, we have no occasion to consider the Government's argument that the term ranges more broadly to cover any stamp used to identify matter, including postal receipts and money orders, which has passed through postal channels.

27. See note 24, *supra.*

28. See note 24, *supra.*

they are to be found, or to the single-ness or multiplicity of their uses. Rather, the clear purpose of Section 503 is to outlaw the falsification of any official mail-marking stamp, and thereby to eliminate the capability for impressing mailmarks which give the appearance of genuineness.[29] In our view, it suffices that the imitated stamp does substantial, though not the entire, postmarking service in the Nation's post offices, and notwithstanding its engagement in other postal functions as well.

GX–3 survives that test. The uncontradicted evidence at appellant's trial established that the Post Office Department's all-purpose stamp, of which GX–3 was a copy, is regularly utilized to postmarking registered and certified mail.[30] It disclosed, too, that a number of smaller post offices across the country also use the all-purpose stamp for postmarking first-class mail.[31] It is immaterial, then, that most post offices do not employ the all-purpose stamp for postmarking first-class mail, or that many employ it for a variety of purposes. We sustain the jury's finding, implicit in its verdict, that GX–3 was a postmarking stamp within the contemplation of Section 503.

### III

As an alternative to his first contention, appellant argues that unless the expression "postmarking stamp" is limited strictly to devices used to cancel postage stamps, Section 503 becomes unconstitutionally vague. More specifically, appellant's position, in his words, is that "[i]f the term 'postmarking stamp' . . . is to be given a construction sufficiently broad to encompass GX–3—i. e., broad enough to encompass an all-purpose rubber dating stamp primarily used to stamp receipts and validate postal money orders, and bearing no wavy lines or 'U.S.P.O.' designation, but which some small post offices also use as a postmark—then the phrase lacks the 'technical or other special meaning' required by the Constitution." [32] Appellant's approach thus proceeds on the premise that persons of ordinary intelligence would not know that a stamp such as GX–3 is used not only to validate money orders but also to postmark mail matter;[33] and that resultantly the statute unconstitutionally compels them to speculate as to its meaning, and thus to act, if at all, at their peril.[34] This rationale, however, ignores the realities which are as much observed in applying the void-for-vagueness precept as well as other legal principles.

To be sure, penal statutes must "convey[] sufficiently definite warnings as to the proscribed conduct" [35] to enable affected citizens to ascertain in advance the activities they are legally free to pursue.[36] As we have declared,

29. See note 24, *supra.*

30. See text *supra* at note 16.

31. See text *supra* at note 17.

32. The quoted language is from Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). It will be recalled, however, that the evidence showed that the all-purpose stamp is used not only to postmark first-class mail in smaller post offices, but also to postmark registered and certified mail in post offices generally. See text *supra* at notes 16–17.

33. See text *supra* at notes 15–18.

34. See, *e. g.*, Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Connally v. General Constr. Co., *supra* note 32, 269 U.S. at 391, 46 S.Ct.

126; Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 205, 414 F.2d 1097, 1101 (1968). Thus appellant's constitutional attack advances only the contention that § 503 inadequately warns of the conduct prohibited. It does not incorporate any argument that because of ambiguity § 503 may embrace constitutionally protected behavior.

35. United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

36. For a discussion of the foundations and scope of the void-for-vagueness doctrine in its application to criminal statutes, see Ricks v. District of Columbia, *supra* note 34, 134 U.S.App.D.C. at 204–206, 414 F.2d at 1100–1102.

"[t]he imposition of criminal liability for behavior which a person could not reasonably understand to be prohibited offends the most rudimentary consideration of fairness."[37] And as the Supreme Court, summing up the central teaching of the cases, has said, a "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."[38]

On the other hand, due process does not demand unattainable feats of statutory clarity.[39] The void-for-vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general

enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibitive."[40] A law is sufficiently definite "if the general class of offenses to which [it] is directed is plainly within its terms, . . even though marginal cases could be put where doubts might arise."[41] And surely it suffices that the statutory language gives definite warning of the prohibited conduct when measured by general understanding.[42] Not only is a penal statute sufficiently certain when it employs "words or phrases having a technical or other special meaning,"[43] as appellant suggests,[44] but also when its terminology, taken in context, is commonly grasped.[45] Particularly is this so where, as here, scienter is made an essential element of the offense.[46]

37. *Id.* at 205, 414 F.2d at 1101.

38. Connally v. General Constr. Co., *supra* note 32, 269 U.S. at 391, 46 S.Ct. at 127.

39. United States v. Petrillo, *supra* note 35, 332 U.S. at 7–8, 67 S.Ct. 1538.

40. Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

41. United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). *Accord,* United States v. Petrillo, *supra* note 35, 332 U.S. at 7, 67 S.Ct. 1538. See also United States v. National Dairy Prods. Corp., 372 U.S. 29, 32–36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); United States v. Kahriger, 345 U.S. 22, 33–34, 73 S.Ct. 510, 97 L.Ed. 754 (1953).

42. Roth v. United States, 354 U.S. 476, 491–492, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); United States v. Petrillo, *supra* note 35, 332 U.S. at 8, 67 S.Ct. 1538. See also cases cited *infra* note 45.

43. Cline v. Frink Dairy Co., 274 U.S. 445, 459, 47 S.Ct. 681, 685, 71 L.Ed. 1146 (1927), quoting Connally v. General Constr. Co., *supra* note 32, 269 U.S. at 391, 46 S.Ct. 126.

44. See text *supra* at note 32.

45. Perez v. United States, 402 U.S. 146, 153, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) ("extortionate credit transactions"); United States v. Vuitch, 402 U.S. 62, 70–73, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971) (mother's "health"); United States v. National Dairy Prods. Corp.,

*supra* note 41, 372 U.S. at 31–36, 83 S.Ct. at 597, 599, ("unreasonably low prices for the purpose[s] of destroying competition or eliminating a competitor"); Scales v. United States, 367 U.S. 203, 220–224, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) ("membership" in organization); McGowan v. Maryland, 366 U.S. 420, 428, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961) ("merchandise essential to, or customarily sold at, or incidental to, the operation of" recreational facilities); United States v. Ragen, 314 U.S. 513, 523–526, 62 S.Ct. 374, 86 L.Ed. 383 (1942) ("commissions"); Bandini Petroleum Co. v. Superior Ct., 284 U.S. 8, 16–18, 52 S.Ct. 103, 76 L.Ed. 136 (1931) ("unreasonable waste" of natural gas); United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508 (1930) ("political purpose"); Connally v. General Constr. Co., *supra* note 32, 269 U.S. at 393–395, 46 S.Ct. at 128, 129 ("current rate of per diem wages in the locality where the work is performed"); Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242, 249–250, 42 S.Ct. 289, 66 L.Ed. 595 (1922) ("unjust and unreasonable rent"); United States v. Union Pac. R. R., 234 U.S. 495, 496, 34 S.Ct. 995, 58 L.Ed. 1426 (1914) ("long and short haul"); Baltimore & O. R. R. v. ICC, 221 U.S. 612, 619–620, 31 S.Ct. 621, 55 L.Ed. 878 (1911) ("emergency").

46. Colten v. Kentucky, *supra* note 40, 407 U.S. at 111, 92 S.Ct. 1953; United States v. National Dairy Prods. Corp.,

■ We do not perceive in Section 503 any vagueness offensive to due process. As we have said, the term "postmarking" is commonly understood to refer to a mark officially placed by the Post Office Department on mail matter, and manifestly a "postmarking stamp" is a stamp used to impress such a mark.[47] We think ordinary people would realize that the prohibitions of Section 503 extend to the *forgery* and *counterfeiting* of such a stamp, and to the possession of a *forged* or *counterfeited* duplicate of such a stamp with intent to use it. Neither of these offenses—forgery, counterfeiting nor possession—can be committed unless the infringing acts are accompanied by an evil intent.[48] A good deal of ambiguity can be dissipated when "the statute adds as a condition that the conduct is criminal only in case the accused knows that what he intends is wrong,"[49] and no residuum of doubt can be detected here. We need not speculate as to whether there could be instances in which the application of Section 503 might become doubtful. It suffices that the general category of offenses which it clearly embraces includes the present case.[50]

### IV

■ The admission into evidence of the identification cards of Roger M. Dix, which were discovered in appellant's apartment, is the basis for further complaint. Shortly after appellant's arrest, Inspector McRae obtained a warrant authorizing a search of the apartment and the seizure of any stolen postal money orders found therein.[51] During the course of the search, Inspector McRae came upon the cards in a bureau drawer and, noting the name they bore and recalling that appellant had used a similar name in ordering the stamp in question,[52] he appropriated them. The controversy over their admission springs from the consideration that they were not mentioned in the search warrant as items to be seized.[53] The trial judge, over appellant's objection, allowed their introduction.[54]

The Fourth Amendment provides that search warrants shall "particularly describ[e] the . . . things to be seized."[55] Nearly a half century ago

*supra* note 41, 372 U.S. at 35, 83 S.Ct. 594; Boyce Motor Lines v. United States, 342 U.S. 337, 342, 72 S.Ct. 329, 96 L.Ed. 367 (1952); Screws v. United States, 325 U.S. 91, 101–103, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United State v. Ragen, *supra* note 45, 314 U.S. at 524, 62 S.Ct. 374; Gorin v. United States, 312 U.S. 19, 27–28, 61 S.Ct. 429, 85 L.Ed. 488, and cases cited in n. 13; Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502–503, 45 S.Ct. 141, 69 L.Ed. 402 (1925).

47. See text *supra* at note 23.

48. See discussion *infra* Part V.

49. United States v. Dennis, 183 F.2d 201, 215 (2d Cir. 1950), aff'd, 341 U.S. 494, 499, 500, 515–516, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). See also cases cited *supra* note 46.

50. See notes 40–41, *supra,* and accompanying text.

51. See text *supra* at note 11.

52. See note 13, *supra,* and accompanying text.

53. Neither the warrant nor its supporting affidavit was produced at trial. Appellant concedes, however, that a warrant was obtained, and does not contest its validity; and the Government concedes that neither the warrant nor the affidavit mentioned Dix' identification cards, of which the authorities then had no knowledge.

54. A related argument is that the trial judge should have delayed the ruling on appellant's objection until after a review of the search warrant. Since, however, the Government admitted that the warrant designated only money orders for seizure, see note 53, *supra,* production and review of the warrant could not have established anything more of relevance to appellant's position.

55. "The right of the people to be secure in their persons, homes, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. amend. IV.

the Supreme Court, in Marron v. United States,[56] declared that "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." [57] Some other courts have similarly held that seizure of an item not specifically described in the warrant legalizing the search was unlawful.[58]

Nonetheless, over the years since *Marron*, still other courts have realized that the broadly-stated doctrine of that case has its exceptions.[59] For a generation, we ourselves have considered it "well established that given a lawful search some things may be seized in connection therewith which are not described in the warrant. . . ." [60] A situation exceptional to *Marron*—which *Marron* itself recognizes—is found where, upon execution of a search warrant, a person

is arrested on the premises and a search of the premises is independently justifiable as incidental to the arrest.[61] Another exceptional situation, bred in the days before Warden v. Hayden,[62] arises when the undescribed articles seized are the instrumentalities or fruits of crime.[63] Without undertaking to catalogue all possible qualifications upon *Marron*, we hold that the situation before us invoked yet another.

Inspector McRae entered appellant's apartment pursuant to the authority conferred by the search warrant, the validity of which is not in issue. Nothing before us suggests that, at the time he came across the cards, he was not properly engaged in execution of the warrant. More than a decade ago we held, in Johnson v. United States,[64] that where that is so, the fact that an incriminating article discovered is unspecified in the warrant does not impugn the validity of its seizure.[65] That conclusion is supported by highly respecta-

56. 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

57. *Id.* at 196, 48 S.Ct. at 76.

58. Some of these decisions rest exclusively on the ground that the items seized were not specifically described in the search warrant. *E. g.*, United States v. Kirschenblatt, 16 F.2d 202, 203–204, 51 A.L.R. 416 (2d Cir. 1926); Hagen v. United States, 4 F.2d 801, 802 (9th Cir. 1925); United States v. Friedberg, 233 F. 313, 315–318 (E.D.Pa.1916). Other decisions, predating Warden v. Hayden, 387 U.S. 294, 300–306, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), rest wholly or partly on the ground that the items were merely evidence and not instrumentalities of crime. *E. g.*, In re No. 191 Front Street, 5 F.2d 282, 285–286 (2d Cir. 1924); Honeycutt v. United States, 277 F. 939, 941 (4th Cir. 1921); Woo Lai Chun v. United States, 274 F.2d 708, 712, 79 A.L.R.2d 999 (9th Cir. 1960).

59. See cases cited *infra* notes 60–63, 66.

60. Palmer v. United States, 92 U.S.App. D.C. 103, 104, 203 F.2d 66, 67 (1953).

61. Marron v. United States, *supra* note 56, 275 U.S. at 198–199, 48 S.Ct. 74. *Accord*, Palmer v. United States, *supra* note 60, 92 U.S.App.D.C. at 104, 203 F. 2d at 67. But see Woo Lai Chun v.

United States, *supra* note 58, 274 F.2d at 712.

62. *Supra* note 58.

63. We so held in Johnson v. United States, 110 U.S.App.D.C. 351, 293 F.2d 539 (1961), cert. denied, 375 U.S. 888, 84 S. Ct. 167, 11 L.Ed.2d 118 (1963). A police officer searching the accused's bedroom, pursuant to a warrant describing numerous articles of stolen personal property, opened a dresser drawer and spotted a credit card and a statement from a department store, both bearing the complaining witness' name. Although neither the credit card nor the statement was specified in the warrant, we upheld the seizure. We stated that "[a]n officer engaged in a lawful search is not confined to seizing only those items described in the warrant, especially when the unlisted items seized are instrumentalities of a crime." *Id.* at 352, 293 F.2d at 540. Among other cases recognizing the instrumentality- or fruit-of-crime exception are United States v. Howard, 138 F.Supp. 376, 380–381 (D.Md.1956); In re Heckman, 35 F.2d 209, 210 (W.D.N.Y.1929); and Joyner v. Lakeland, 90 So.2d 118, 122 (Fla.1956).

64. *Supra* note 63.

65. See note 63, *supra*.

ble authority elsewhere,[66] and once again we reach it here.

The rationale we find appealing is set forth in the principal opinion in Coolidge v. New Hampshire.[67] As there stated, "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant." [68] And as the opinion continues, "[a]n example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." [69] For "[w]hat the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed toward the accused—and permits the warrantless seizure." [70] And "given the initial intrusion, the seizure of an object in plain view . . . does not convert the search into a general or exploratory one," [71] which was the paramount concern in *Marron*.[72]

In our view, the case at bar is readily and fully encompassed by these principles. We perceive no reason why they should not be applied.[73] We hold that the identification cards in question were

66. United States v. Henkel, 451 F.2d 777, 780–781 (3d Cir. 1971); Anglin v. Director, 439 F.2d 1342, 1346–1348 (4th Cir.), cert. denied, 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971).

67. 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971). The relevant portion of the opinion authored by Justice Stewart, is Part II(C), in which Justices Douglas, Brennan and Marshall concurred.

68. *Id.* at 465, 91 S.Ct. at 2037. However, as the Court emphasized, "it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal." *Id.* (emphasis in original).

69. *Id.*, citing Go-Bart Importing Co. v. United States, 282 U.S. 344, 358, 51 S. Ct. 153, 75 L.Ed. 374 (1931); United States v. Lefkowitz, 285 U.S. 452, 465, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); Stanley v. Georgia, 394 U.S. 557, 571, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (Justice Stewart, concurring in result). The Court added:

Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. . . . And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. . . . Finally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object.

*Id.* 403 U.S. at 465–466, 91 S.Ct. at 2037–2038 (citations and footnotes omitted).

70. *Id.* at 466, 91 S.Ct. at 2038.

71. *Id.* "As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it." *Id.* at 467–468, 91 S.Ct. at 2038, 2039.

72. See text *supra* at note 57.

73. Since Warden v. Hayden, *supra* note 58, has abolished the distinction between instrumentalities of crime and "mere evidence" in search and seizure cases, the evidentiary character of Dix' identification cards presents no obstacle. And since the record makes clear that Inspector McRae knew nothing about the

lawfully seized by Inspector McRae, and were properly admitted into evidence by the trial judge.

### V

■ Another major challenge to appellant's conviction asserts that the evidence adduced at his trial was not sufficient to support findings by the jury that he entertained the criminal intent required by Section 503. One of the offenses specified in that section— by the first clause—is the "forg[ing] or counterfeit[ing] of any postmarking stamp," [74] which undoubtedly must include as an element of the offense the intent to falsify—to make the bogus article appear to be genuine—which those terms inherently imply.[75] Another Section 503 offense—specified by the third clause—is the "possess[ion]" "with intent to use or sell, any forged or counterfeited postmarking stamp." [76]

■ These were the two crimes which indictment in this case laid at ap-

pellant's doorstep. The first count of the indictment, which was predicated on the first clause, charged appellant with causing the forgery and counterfeiting of a postmarking stamp "with intent to make it appear that such postmarking stamp was genuine." [77] The second count, founded on the third clause, charged appellant with possession of a forged and counterfeited postmarking stamp "with intent to use" it. Our careful examination of the trial record convinces us that the evidence legally authorized the jury, if it were so inclined, to infer the existence of the mental elements of the two charges.

As everybody knows, because of the impossibility of demonstrating directly just what a person might at any given time have in mind, intent must be proved circumstantially by resort to the surroundings of the objective activities. In the instant case, the trial judge gave to the jury an instruction incorporating that understanding, and what the jury

cards until their discovery in appellant's dresser drawer, *Coolidge's* requirement, 403 U.S. at 469–470, 91 S.Ct. 2022, that the discovery of evidence in plain view must be inadvertent, is satisfied.

74. See note 1, *supra*.

75. As common law terms, both forgery and counterfeiting connote a false making with a view to deceive. See, *e. g.*, Gilbert v. United States, 370 U.S. 650, 656, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962) ; United States v. Carll, 105 U.S. 611, 613, 26 L.Ed. 1135 (1881) ; United States v. Marigold, 50 U.S. (9 How.) 560, 568, 13 L.Ed. 257 (1850) ; Milton v. United States, 71 U.S.App.D.C. 394, 398–399, 110 F.2d 556, 560–561 (1940) ; Frisby v. United States, 38 App.D.C. 22, 26–27 (1912) ; Errington v. Hudspeth, 110 F. 2d 384, 386 (10th Cir.), cert. denied, 310 U.S. 638, 60 S.Ct. 1087, 84 L.Ed. 1407 (1940) ; J. Bishop, Criminal Law §§ 288, 523 (9th ed. 1923). So also they do in ordinary parlance. There being no indication to the contrary in § 503, we may fairly assume that Congress intended the words to have that meaning. Gilbert v. United States, *supra*, 370 U.S. at 655, 82 S.Ct. 1399. We later point out that the mental element of the offense defined in the first clause of § 503 is supplied by an intent to make a forged or counter-

feited postmarking stamp appear to be genuine. See note 77, *infra*.

By our construction, the specific intent to falsify—implicit in the concept supplied by use of the words "forges or counterfeits" in the first clause of § 503 —is the only intent which is a required element of the offense specified in that clause. Proscription of stamp-fabricating when accompanied by such an intent strikes at the very evil which Congress sought to eradicate. See note 24, *supra*. The second clause similarly and more explicitly defines as a crime the forgery or counterfeiting of an "impression [of a postmarking stamp] with intent to make it appear that such impression is a genuine postmark." See note 1, *supra*. Just as the second clause specifies an intent to falsify the impression of a genuine postmarking stamp, the first clause necessitates an intent to falsify the postmarking stamp itself.

76. See note 1, *supra*.

77. As we have said, an intent to falsify is singularly the mental element of first-clause offenses under § 503. See note 75, *supra*. The first count sufficed to lay a charge under the first clause, for an "intent to make it appear that" a forged or counterfeited "postmarking stamp was genuine" is surely an intent to falsify it.

might have found relevant in the evidence may readily be summarized. Appellant placed the order for GX–3, a stamp identical to the all-purpose stamp used in post offices. He ordered the stamp under the name "Robert M. Dix," and when Bryant picked up the stamp he said that he had come for the order "for Mr. Dix." At the time, as the search of appellant's apartment was to reveal, appellant had identification cards which could aid an impersonation of Dix. The all-purpose stamp which GX–3 duplicated is regularly employed both to postmark mail and to validate postal money orders.[78]

We believe prudent jurors might reasonably deduce from this evidence that appellant ordered the stamp with intent to falsify an all-purpose stamp—a postmarking stamp [79]—as charged in the first count of the indictment. The jury could logically have inferred that these several events were not unconnected coincidences, but were manifestations of a plan preconceived by appellant and Bryant to acquire the stamp for use in a scheme involving either the false postmarking of mail or, much more probably, the fraudulent validation of stolen money orders. The innocence of the transaction was seriously jeopardized by the use of Dix' name both when the order was placed and when it was picked up, and by the fact that appellant possessed Dix' identification cards under circumstances strongly indicating unlawful appropriation. The affair becomes the more suspicious when it is realized that acquisition or possession of a bogus postmarking stamp can hardly serve any aim other than contemplated criminality. The jury was free, of course, to conclude that these facts were unrelated and that somehow appellant was a victim of circumstances. But that is not to say that an inference of innocent activity was compelled or that the conclusion which the jury did reach was unreasonable.[80] On the evidence here, the choice was one for the jury.

We also believe that possession of a false postmarking stamp with a view to its use as the mechanism by which false impressions are to be made either on mail matter or on postal money orders is an intent within the ambit of the third clause of Section 503. A goal involving a marking on mail which simulates an official marking is ipso facto an intent to falsify a postmark. Moreover, in our view, a violation of the third-clause proscription of Section 503 may follow equally from an intent to apply a false postmarking stamp to illicit uses other than postmarking, including the fraudulent validation of stolen money orders.

Appellant argues, however, that the intent which the first and third clauses demand is exclusively the intent to fabricate a postmarking stamp or possess a fabricated postmarking stamp for use in falsifying postmarks on mail, and that a purpose to use it solely to falsify an official mark on other postal items negates any Section 503 violation. He further complains that the trial judge erred in failing to instruct the jury that appellant must have had the specific intent to forge or counterfeit a postmarking stamp, or to possess it for use, *as a postmarking stamp*, as opposed to an all-purpose dating stamp. We are unable to import these limitations into Section 503.

True it is, as we have held, that the stamp in question must be a forged or counterfeited postmarking stamp—be-

---

78. At trial, both sides, quite properly, probed into the uses to which the all-purpose postal stamp was devoted and to which, by the same token, GX-3 could be put. We do not agree with appellant that the Government's evidence or argument on this score was directed toward proving the crime of counterfeiting postal money orders, see 18 U.S.C. § 500 (1970), or that it otherwise exceeded the bounds of propriety.

79. See text *supra* at notes 23–31.

80. Compare, *e. g.*, Hunt v. United States, 115 U.S.App.D.C. 1, 4, 316 F.2d 652, 655 (1963).

cause Congress has said so [81]—and that an intent to use it to falsify postmarks on mail suffices under either clause. But we do not find within the language [82] or the legislative history [83] of Section 503 a moratorium on all illegitimate purposes save those which would falsify postmarks on mail. On the contrary, the language of the first and third clauses condemns the "forg[ing] or counterfeit[ing] [of] any postmarking stamp" and the "possess[ion] with intent to use or sell" of "any forged or counterfeited postmarking stamp," [84] and so Section 503 has read from its inception.[85] This language hardly connotes a confinement of its scope to those forged and counterfeited postmarking stamps which are fabricated or possessed just to falsify postmarks on mail.[86] Rather, the language contrasts sharply with that of the second clause—which was put into the section by amendment of the original prohibition [87]—which proscribes the "forg[ing] or counterfeit[ing]" of "any . . . impression" [of an official postmarking stamp] "with intent to make it appear that such impression is a genuine *postmark*." [88] This contrast, careful analysis discloses, was not a grammatical accident [89] but, history tells us, a deliberate step to enlarge rather than constrict the purview of Section 503.[90] In sum, the first and third clauses recognize the evil proclivities of the false postmarking stamp for what they really are, and outlaws the fabrication of postmarking stamps with intent to falsify them as genuine, and the possession of bogus postmarking stamps with intent to put them to illicit uses. That is hardly consistent with the notion that we are at liberty to write into those clauses limitations which Congress has not seen fit to impose itself.

As appears vividly from the undisputed evidence, the all-purpose stamp, which qualifies as a postmarking stamp,[91] does service in other postal operations as well, including the validation

---

81. See note 1, *supra*, and text *supra* at notes 23–31.

82. See note 1, *supra*.

83. See note 24, *supra*.

84. See note 1, *supra*.

85. See note 89, *infra*.

86. This conclusion gains strength from the consideration that the third clause makes criminal a possession not only with intent to use the forged or counterfeited postmarking stamp, but also a possession with intent to "sell" it. We are unable to conclude that Congress intended to condition the vendor's guilt under the third clause upon his pre-sale intention or his vendee's post-sale intention to use the forged or counterfeited stamp to postmark mail, even though either or both intended to use it to validate illegally obtained money orders.

87. See note 89, *infra*.

88. See note 1, *supra* (emphasis supplied).

89. Our view draws support from the legislative history. The original version of the bill which was to become Section 503 did not contain the second clause; it provided that
> . . . . whoever shall forge or counterfeit any postmarking stamp, . . . or shall make or knowingly use or sell, or have in his possession with intent to use or sell, any [such] forged or counterfeited postmarking stamp, die, plate, or engraving, . . . shall be fined not more than $1,000 or imprisoned for not more than five years, or both.

Hearings on H.R. 5049 Before the House Comm. on the Post Office and Post Roads, 74th Cong., 1st Sess. 29 (1935). Thus the bill, as initially presented, would have prohibited only those activities which related to a forged or counterfeited postmarking device, as distinguished from a forged or counterfeited impression of such device; and that gave the Committee concern. *Id.* at 30. The second clause was inserted, with conforming language in the third clause, to broaden the bill "so as to include impressions of postmarking stamps as well." H.Rep. No 580, 74th Cong. 1st Sess. 1 (1935). See to the same effect, S.Rep. No. 1438, 74th Cong. 1st Sess. 1 (1935). There is, then, no basis for reading the word "postmark" in the second clause as a part of the first.

90. See note 89, *supra*.

91. See text *supra* at notes 23–31.

of postal money orders.[92]  By the same token, a stamp which can impress a false postmark on mail matter—imitating the official postmark made by the all-purpose stamp—possesses also the capability of falsifying the same official marking on money orders which the all-purpose stamp is customarily employed to make.[93]  We think the objective of Section 503, in terms of specific intent which outlaws fabrication or possession of a forged or counterfeit postmarking stamp, was to intercept every scheme which would put the false stamp to a use which would simulate a use which the Post Office Department officially makes of the genuine article.  And the evidence clearly supported the inference that appellant and Bryant had in mind the false validation of postal money orders.  We accordingly reject appellant's claim that the state of the evidence legally disabled the jury from finding the intent prerequisite to conviction.  We reject also the concomitant contention that the trial judge's specific-intent instructions, which embodied the views we have expressed, gave the jury too much range to make the necessary determinations.

## VI

■ After the evidentiary presentations were completed, both sides asked the trial court to include in its charge to the jury an instruction defining the term "postmark."[94]  The trial judge denied both requests.  The charge which the judge gave included instructions to the effect that prerequisites to conviction were proof beyond a reasonable doubt, on the first count, that appellant forged or counterfeited a "postmarking stamp" and, on the second, that he possessed a forged or counterfeited "postmarking stamp."  Appellant contends that the judge's refusal to elaborate on the meaning of these terms was error.

■ It is, of course, of the utmost importance that the judge instruct the jury, "clearly and fully, on the principles of law that apply to and govern the case on trial."[95]  This duty extends to careful explanation of the essential elements of the offense,[96] and to accurate definition of words and phrases having technical meanings.[97]  Patently, however, there is no need for the court to tell the jurors what as individuals they already know.  Thus it is unnecessary for the trial judge in his charge to define words which are in common use, and are such as are readily comprehended by persons of ordinary intelligence, where the words are applied in the judge's instructions in their conventional sense.[98]

92.  See text *supra* at notes 15–18.

93.  18 U.S.C. § 500 (1970) specifically prohibits, among other things, the forgery or counterfeiting of postal money orders. Nothing in § 503, the statute involved here, necessitates an interpretation which would require law enforcement officers, aware that a forged or counterfeited postmarking stamp is intended for use in the false validation of money orders, to await the achievement of that objective.

94.  The Government requested that the jury be told that a "postmarking stamp" is "a stamp which is used to place official post office markings on such items as mail, postal money orders, and so forth."  Defense counsel requested that the term "postmark" be defined as "a stamp or mark put on a letter received at the Post Office for transmission through the mail."

95.  United States v. Young, 150 U.S.App. D.C. 98, 109, 463 F.2d 934, 945 (1972) (concurring opinion).

96.  Mitchell v. United States, 129 U.S.App. D.C. 292, 295, 299, 394 F.2d 767, 770, 774 (1968) ; Jackson v. United States, 121 U.S.App.D.C. 160, 161–162, 348 F. 2d 772, 773–774 (1965) ; Byrd v. United States, 119 U.S.App.D.C. 360, 362–363, 342 F.2d 939, 940–941 (1965).

97.  Mitchell v. United States, *supra* note 96, 129 U.S.App.D.C. at 294, 394 F.2d at 769 ; Wright v. United States, 102 U.S.App.D.C. 36, 44–45, 250 F.2d 4, 12– 13 (1957).  *Cf.* McFarland v. United States, 85 U.S.App.D.C. 19, 20, 174 F.2d 538, 539 (1949).

98.  Byrd v. United States, 114 U.S.App. D.C. 117, 118, 312 F.2d 357, 358 (1962) (word "home" need not be defined in charge incorporating the legal principle that a man has a right to repel an intruder) ; Byas v. United States, 86 U.S. App.D.C. 309, 311–312, 182 F.2d 94, 96– 97 (1950) (no need to define "arrange" in prosecution under prostitution

Appellant's instant claim is substantially similar to two others which we have already found lacking.[99] In so doing, we pointed out in each instance that the word "postmark" has a widely accepted and familiar meaning—an official mark of the Post Office Department on matter transmitted through the mails.[100] As one court has said, "[t]hough 'postmark' is peculiar to the mails it is a word commonly used and understood. It is not necessary to consider it as a technical word."[101] We have no cause to believe that common understanding of a postmarking stamp —a stamp officially used to make a postmark—is any less pervasive. In the case at bar, the jury needed only to draw upon this fund of general knowledge to determine whether GX–3 was a postmarking stamp. Indeed, appellant's requested definition,[102] which matched popular understanding of the defined term,[103] would have added nothing to the jury's store of knowledge.

We are advertent, however, to the running debate between appellant and the Government, both in the trial court and here, as to the precise concept of a postmarking stamp which Section 503 embodies.[104] But the question at hand —with reference to the court's refusal to define "postmark"—is not so much what the statutory language actually means as it is what the jurors at appellant's trial must have felt it meant. It matters not that the reach of Section 503 may be broader than the common image of a postmarking stamp, for it is evident from the verdict that even under the narrower concept—appellant's definition [105]—he was guilty in the eyes of the jury. So, even if, as the Government asserts, the statutory term "postmarking stamp" encompasses stamps used to validate postal money orders as well as those used to officially mark mail, the jury's verdict, presumably based upon the narrower understanding, was fully valid.

We are mindful, too, that the evidence showed that the all-purpose stamp, which GX–3 copied, is utilized by post offices both to postmark mail and to authenticate money orders.[106] That circumstance left open the possibility that one or more jurors, lacking the guidance that a definition by the court would have afforded, might have deemed GX–3 a postmarking stamp simply because of its use as to money orders and the further possibility that that view might not conform to Section 503.[107] We think,

statute); Thompson v. United States, 272 F.2d 919, 922 (5th Cir. 1959), cert. denied, 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960) (not necessary to define "counsel" and "induce" as used in aiding and abetting statute); Rimerman v. United States, 374 F.2d 251, 254 (8th Cir.), cert. denied, 387 U.S. 931, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967) (trial court properly refrained from attempting definition of "possessed," "conceal," "sell," "passing" and "publishing" as used in counterfeiting statute); Bohn v. United States, 260 F.2d 773, 778–779 (8th Cir. 1958), cert. denied, 358 U.S. 931, 79 S. Ct. 320, 3 L.Ed.2d 304 (1959) (definition of word "business" and phrase "engaged in business" unnecessary); Ramsey v. United States, 245 F.2d 295, 297 (9th Cir. 1957) (definition of "business" unnecessary in prosecution for unlawfully carrying on business of distiller and rectifier); Casey v. United States, 191 F.2d 1, 4 (9th Cir.), rev'd on other grounds, 343 U.S. 808, 72 S.Ct. 999, 96

L.Ed. 1317 (1951) (no error in failing to define "radio station" in prosecution for operating radio station without a license).

99. See Parts II, III, *supra*.

100. See text *supra* at notes 23, 47.

101. Severs v. Abrahamson, *supra* note 23, 124 N.W.2d at 152. See also Wolpa v. United States, 86 F.2d 35, 39–40 (8th Cir. 1936), cert. denied, 299 U.S. 611, 57 S.Ct. 317, 81 L.Ed. 451 (1937) ("postcard" conveys "no other meaning than of official United States postal card with postage stamp printed thereon."); Hanbury v. Commonwealth, 203 Va. 182, 122 S.E.2d 911, 915 (1961).

102. See note 94, *supra*.

103. See text *supra* at notes 23, 47.

104. See Part V, *supra*.

105. See note 94, *supra*.

106. See text *supra* at notes 15–18.

107. See note 26, *supra*.

however, that these contingencies do not impugn the verdict. The evidence demonstrated that GX-3's genuine counterpart—the all-purpose stamp—is a stamp employed extensively to postmark mail,[108] and thus is surely a postmarking stamp within the contemplation of Section 503.[109] Unless that evidence was totally rejected, it could only lead to a finding that GX-3 was a mail-marking stamp, whatever else as a stamp it might be. With the evidence on that score compelling, because highly significant and wholly uncontradicted, it seems extremely unlikely that any juror could have doubted that such was the fact. We hold that any conceivable error resultant from the court's failure to give an instruction confining the concept of postmarking stamps to mail-marking devices was in any event harmless.[110]

## VII

We come, lastly, to appellant's contention that Section 503 does not authorize conviction under the first and third clauses simultaneously. The point he seeks to make is that the act of forging and counterfeiting a postmarking stamp and the act of possessing such a stamp merged into a single crime for which there could be but a single conviction. We do not agree.

The problem here is not one of consecutive sentences,[111] for the trial judge imposed a general sentence on the two counts, but rather is one of multiple convictions.[112] The question is "[w]hat Congress has made the allowable unit of prosecution," [113] and in the absence of a contrary legislative intent [114] "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." [115]

When we apply that test to the instant case, we are led to the conclusion that the two offenses of which appellant was convicted did not merge. Conviction under the first clause of Section 503 required proof that appellant caused the forging or counterfeiting of a postmarking stamp with intent, as specified in the first count of the indictment,[116] to

108. See text *supra* at notes 16–17.

109. See text *supra* at notes 23–31.

110. See, e. g., Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

111. See, e. g., Callanan v. United States, 364 U.S. 587, 588–597, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); Ladner v. United States, 358 U.S. 169, 173–179, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); Gore v. United States, 357 U.S. 386, 387–393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); Prince v. United States, 352 U.S. 322, 324, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (en banc 1967).

112. This problem survives the absence of consecutive sentences. As we observed in United States v. Canty, 152 U.S.App. D.C. 103, 115, 469 F.2d 114, 126 (1972), "it cannot be assumed that a multiplicity of concurrent sentences will have no adverse consequences. . . ." (footnote omitted). We now say the same for multiple convictions.

113. United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). See also

Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); United States v. Canty, *supra* note 112, 152 U.S. App.D.C. at 115, 469 F.2d at 126; United States v. Hopkins, 150 U.S.App.D.C. 307, 313–314, 464 F.2d 816, 822–823 (1972).

114. As to the contrasting role of legislative intent in consecutive-sentence cases, see, e. g., Heflin v. United States, 358 U.S. 415, 419–420, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); Ladner v. United States, *supra* note 111, 358 U.S. at 177–178, 79 S.Ct. 209; Bell v. United States, *supra* note 113, 349 U.S. at 84, 75 S.Ct. 620.

115. Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). See also Gore v. United States, *supra* note 111, 357 U.S. at 391, 78 S.Ct. 1280; Morgan v. Devine, 237 U.S. 632, 640–641, 35 S.Ct. 712, 59 L.Ed. 1153 (1915); United States v. Canty, *supra* note 112, 152 U.S.App.D.C. at 116, 469 F.2d at 127; United States v. Spears, 145 U.S.App.D.C. 284, 288, 449 F.2d 946, 950 (1971); Evans v. United States, 98 U.S.App.D.C. 122, 123, 232 F.2d 379, 380 (1956).

116. See text *supra* at note 77.

make it appear that the stamp was genuine.[117] Conviction under the third clause, on the other hand, required proof that appellant possessed the forged or counterfeited postmarking stamp with intent to use it deceptively.[118] Each offense had its own elements, and the two offenses had few in common; the acts physical and mental, comprising them were incongruent. The first-clause offense of forging or counterfeiting a postmarking stamp did not necessitate subsequent possession of the stamp or of an intent to use it, as distinguished from an intent during the fabrication process to falsify it. The third-clause offense of possessing a forged or counterfeited postmarking stamp did not necessitate possession by the party who forged or counterfeited it, or possession with an intent other than to put the forged or counterfeited article to some devious use. The indictment charged the two offenses as separate enterprises comprising separate historical events, and the evidence demonstrated that indeed they were.[119] Nothing in the text or the legislative history of Section 503 suggests a congressional purpose to treat them as a single crime.[120]

One other matter deserves comment, and that is the general sentence—of imprisonment for a maximum five-year period—which the trial judge imposed on the two counts following appellant's conviction. Sentencing in the case at bar occurred some months prior to our decision in United States v. Straite,[121] wherein we condemned general sentences on two broad grounds.[122] We pointed out that "[w]hen an appellate court reverses less than all of a multi-count conviction, it usually must remand, either because the general sentence imposed is greater than the maximum permitted on the remaining counts, or because of the possibility that the sentencing judge was influenced by the multiplicity of offenses."[123] We added that "the general sentence hampers the prison and correctional authorities in the accomplishment of their rehabilitative purposes, and confuses the defendant by disguising the essence of the court's decision on the individual offenses committed."[124] Because a general maximum 15-year sentence had been imposed on Straite for two maximum 10-year and one maximum 15-year offenses, we vacated the sentences and remanded for resentencing.[125]

We maintain our complete accord with the holding in *Straite* and the wholesome policies underlying it.[126] But the fact of the matter is that none of the difficulties identified in *Straite* is visited upon appellant here. Our disposition of this appeal augurs no reconstruction of appellant's sentence since we affirm his conviction on both counts.[127] The

---

117. See note 75, *supra.*

118. See Part V, *supra.*

119. See text *supra* at note 77.

120. On this basis, we distinguish Prince v. United States, *supra* note 111, and Heflin v. United States, supra note 114, upon which appellant relies. And see Ebeling v. Morgan, 237 U.S. 625, 628–631, 35 S.Ct. 710, 59 L.Ed. 1151 (1915).

121. 138 U.S.App.D.C. 163, 425 F.2d 594 (1970).

122. The Fifth Circuit had previously denounced general sentences in Benson v. United States, 332 F.2d 288 (1964), which we found persuasive.

123. United States v. Straite, *supra* note 121, 138 U.S.App.D.C. at 165, 425 F.2d at 596 (footnote omitted).

124. *Id.* (footnote omitted).

125. *Id.*

126. Since we find *Straite* inapposite here, see text *infra* at notes 127–128, we need not inquire whether in any event it would apply retroactively to appellant's previously-imposed sentence. See Brown v. United States, 368 F.2d 841 (5th Cir. 1966). *Cf.* Straite v. United States, *supra* note 121, 138 U.S.App.D.C. at 165 n. 5, 425 F.2d at 596 n. 5; Benson v. United States, *supra* note 122, 332 F.2d at 292 n. 10.

127. *Straite* may be applicable although the conviction on which the general sentence is imposed is affirmed on all counts. See 138 U.S.App.D.C. at 165, 425 F.2d at 596. See also United States v. Mack, 151 U.S. App.D.C. 162, 169, 466 F.2d 333, 340

exigencies of rehabilitation do not call for resentencing since during the pendency of the appeal appellant was placed on work release and then on parole, on which he presently remains. In these circumstances, we are unable to perceive any useful purpose which a remand for resentencing could achieve.[128]

For the foregoing reasons, the judgment of conviction appealed from has been affirmed.[129]

(1972). The affirmance simply removes one category of the difficulties inherent in general sentences.

128. Compare McCollum v. United States, 437 F.2d 61, 63 (5th Cir. 1969).

