**UNITED STATES of America**

v.

**Cyrus T. ANDERSON, Appellant.**

**No. 73–1304.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 5, 1974.

Decided Oct. 22, 1974.

Opinion Nov. 12, 1974.

Certiorari Denied March 24, 1975.

See 95 S.Ct. 1427.

Richard W. Boone, Washington, D. C., with whom Walter J. Bonner, Edward C. O'Connell and William H. Seckinger, Washington, D. C., were on the brief, for appellant in No. 73–1304.

Stuart M. Gerson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed and John A. Terry, Asst. U. S. Atty., were on the brief for appellee. Earl J. Silbert, U. S. Atty., and James E. Sharp, Asst. U. S. Atty., at the time the record was filed, also entered appearances for appellee.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Cyrus T. Anderson contests his conviction by a jury on three counts of bribery of a United States Senator.[1] His main argument is that he was deprived of a fair trial as the result of surprise and perjury in connection with the testimony of Betsey Shipley Norton, a key witness for the Government.[2] Anderson also ad-

1. The statutory predicate for the conviction is 18 U.S.C. § 201(b) (1970), which in relevant part provides:

Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . ., or offers or promises any public official . . . to give anything of value to any other person or entity, with intent—

(1) to influence any official act . . .

Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

By 18 U.S.C. § 201(a) (1970), "public official" includes a Member of Congress.

2. We resolve this contention in Parts III(A), (C), infra.

vances other grounds for reversal, each of which we address in the course of this opinion.[3] We find Anderson's arguments unpersuasive, and accordingly affirm the conviction on all counts.

## I. THE FACTUAL BACKGROUND

Anderson was a registered congressional lobbyist for Spiegel, Inc.,[4] a Chicago-based merchandiser.[5] Since Spiegel conducted its sales primarily through the mails, its financial well-being was directly related to the level of third-class mail rates. Daniel B. Brewster was a United States Senator, and a member of the Senate Committee on Post Office and Civil Service. It was the alleged bribery of Brewster by Anderson, as the *alter ego* of Spiegel, that gave birth to this litigation.

The theory of the prosecution was that Anderson on several occasions delivered monies to Brewster with corrupt intent to influence his action on postal-rate legislation coming before him in his official capacity. An indictment so charged,[6] and the jury, at Anderson's trial jointly with Spiegel[7] and Brewster,[8] found Anderson guilty as charged.[9]

The Government's case against Anderson, and by the same token the jury's verdict, rested notably upon the testimony of John Francis Sullivan, formerly an aide to Brewster,[10] and Betsey Shipley Norton, a close friend of Anderson.[11] Primarily through these two witnesses, the Government sought to prove the execution of a scheme designed to route payments from Spiegel through Anderson to Brewster and to a nominal campaign committee for him. We need not recite in full the maze of details comprising the conflicting testimonial versions of the questioned transactions. Rather, we recount only so much of the evidence, pro and con, as will bring into sharp focus the several points Anderson raises on this appeal.[12]

### A. *The Sullivan Testimony*

Testifying under a grant of immunity from prosecution, John Sullivan delineated for the jury a series of contacts between Anderson, Brewster and himself, in the course of which the events germi-

3. We deal with Anderson's other claims in Parts II, III(B), IV, V, *infra.*

4. Hereinafter we refer to Spiegel, Inc., as "Spiegel." Two individuals having the surname "Spiegel" are later mentioned. We cojoin their first names to distinguish them.

5. Anderson had been so employed by Spiegel since about 1959. In addition to his salary, Anderson was provided with a $30,000-per-year account usable for contributions to District of Columbia committees for educational and voter-registration purposes. As we shall see, that account could not accommodate the monetary payments which Anderson allegedly made to Brewster.

6. In original form, the indictment charged in five counts five separate payments as bribery by Anderson. Two of the counts were dismissed and the remaining three, on a renumbered indictment, were submitted to the jury, which convicted on each. The indictment similarly charged Brewster's receipt of the same payments as bribery by him. But see note 9, *infra.*

7. After the trial got under way, Spiegel entered pleas of guilty to making unlawful payments of gratuities, in violation of 18 U.S.C. § 201(f) (1970), as lesser offenses included in two counts charging bribery. See United

States v. Brewster, 165 U.S.App.D.C. 1, 506 F.2d 62 (1974). After the verdict against Anderson was returned, a $10,000 fine was imposed on each count.

8. Previously, on Brewster's motion, the indictment had been dismissed as to him on the ground that prosecution for the acts charged to him was barred by the Speech or Debate Clause, U.S.Const. art. I, § 6. On the Government's appeal, the Supreme Court reversed that ruling. United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

9. See note 6, *supra.* Brewster also was convicted, not of bribery, but of receiving illegal gratuities, 18 U.S.C. § 201(g) (1970). We have, on his appeal, reversed his conviction and remanded his case for a new trial because of misinstruction of the jury as to him. United States v. Brewster, *supra* note 7.

10. Sullivan was Brewster's executive assistant, and later his administrative assistant, during the period 1963–69.

11. Further details are summarized in Parts III(A), (C), *infra.*

12. Including, of course, the contention that the evidence was legally insufficient to support Anderson's conviction. See Part IV(C), *infra.*

nating the bribery counts against Anderson assertedly transpired.[13] What follows is a summary of Sullivan's testimony in that regard.

Late in 1965, a political fundraiser visited Brewster at his Senate office in Sullivan's presence. Brewster was nearing the end of his term and, though not then an announced candidate, he contemplated a run for reelection. The visitor mentioned a proposal by the Postmaster General to increase mail rates, and Brewster said that he had no fixed opinion on the merits of the proposal. The visitor then told Brewster that if he remained uncommitted on the subject, she could get money for his reelection campaign from Anderson.[14] Brewster suggested that Anderson call Sullivan in that connection.[15]

In January, 1966, Sullivan received a telephone call from Anderson, who stated his understanding that Brewster "was going to keep an open mind" on the rate-increase proposal and said that he "was sending something" to the office. A few days later a check for $5,000 arrived, addressed to Brewster's earlier visitor. The check was drawn by the Hotel and Restaurant Employees and Bartenders International Union of Cincinnati, Ohio,[16] and was made payable to the "D. C. Committee for Maryland Education" (DCCME).[17] The check was deposited in a bank account opened in the name of DCCME, which became a committee to accept campaign contributions for Brewster.[18]

A year passed without any other known contact by or with Anderson. In January, 1967, however, Anderson conferred with Brewster and Sullivan in their Senate offices. Anderson revealed his connection with Spiegel[19] and voiced Spiegel's opposition to higher postal rates. As the meeting drew to a close, Anderson gave Brewster an envelope containing $5,000 in cash, and Brewster told Anderson that he "would do all he possibly could to be of assistance to Spiegel . . .." The $5,000 was placed in a safe in Sullivan's office, and was subsequently used for cash expenditures.[20]

On April 5, 1967, a bill seeking postal-rate raises was introduced in Congress. Shortly thereafter, Anderson obtained from Spiegel a check for $13,500 payable to DCCME and, with help from Betsey Norton, converted it into cash.[21] Later that month Anderson, accompanied by a

---

13. Testimony given by other witnesses tended to corroborate Sullivan's version of these events.

14. Brewster stated that, as a yet unannounced candidate, he could not accept campaign contributions. The visitor told him that "that is no problem," and suggested that he seek advice as to organization of a committee in the District of Columbia "where you can put the money."

15. That suggestion foreran one of the problems presented on appeal, which we discuss in Part IV(A), *infra.*

16. Additional details regarding the check were supplied by other testimony. Anderson, the Bartenders Union's legislative representative in Washington, asked the union to contribute the $5,000, stating that Brewster was interested in the committee and that the money would be devoted to education and voter registration in Maryland. Anderson gave instructions as to the amount of the check, the payee, and to whom it should be sent. There had been no prior dealings between Brewster and the union, but Anderson had been instrumental in securing passage of legislation favored by the union and for that reason it felt that Anderson's request should be honored.

17. The organization known as DCCME was nonexistent when the check arrived, but shortly thereafter Brewster decided to animate it as a District of Columbia campaign organization not, at that time, required to report campaign contributions. Sullivan was made president of DCCME and a political supporter of Brewster became its treasurer.

18. This transaction was the subject of one of the five bribery counts against Anderson, but the count was later dismissed for the stated reason that Spiegel had no connection with it.

19. See note 5, *supra,* and accompanying text.

20. This transaction was the subject of one of the counts on which Anderson was convicted.

21. Anderson asked Ms. Norton to cash the check for him, and instructed her to endorse the check "B. A. Shipley," her maiden name, as secretary-treasurer of DCCME. Ms. Norton did that and brought to Anderson the $13,500 in cash.

man introduced as Morris Spiegel,[22] again called on Brewster and Sullivan. There was discussion of the pending bill, during which Morris Spiegel handed an envelope to Brewster. Inside the envelope was $4,500 in cash, which also found its way into the DCCME bank account.[23]

A third payment was made in July, 1967. On Brewster's order, Sullivan telephoned Anderson and inquired as to whether any more money would be forthcoming. Anderson answered "yes, he did have some more money, for the Senator—five thousand dollars—but he had not received a check from Spiegel in Chicago, yet." After receiving several more telephone calls from Sullivan, Anderson went to Sullivan's office and made out a personal check for $5,000, leaving the name of the payee blank.[24] Sullivan wrote in DCCME as payee and later deposited it in DCCME's account.[25]

### B. The Norton Testimony

Though, like Sullivan, the recipient of a grant of immunity, Betsey Norton[26] remained an outwardly reluctant witness.[27] Nonetheless, her initial effort to avoid testifying having failed,[28] the Government called her to the witness stand as the second week of trial began. Disregarding for the moment further difficulties in securing her testimony, which generate some of the issues on appeal,[29] we relate the highlights of that testimony.

Ms. Norton met Anderson in 1965. A close friendship developed, and she frequently assisted Anderson in his projects. She became aware of his employment by the Spiegel company and attended some of his meetings with Modie Spiegel, its chief executive officer, in Chicago and Washington.

Over a period of three years, at Anderson's request Ms. Norton cashed a number of Spiegel checks for him, including two related to contributions to DCCME.[30] On occasion Modie Spiegel, unable to contact Anderson, telephoned her to confirm delivery of "the package" —money obtained by cashing Spiegel checks, some of which had been ear-

---

**22.** No connection between Morris Spiegel and the Spiegel Company is ascertainable.

**23.** This transaction was the subject of another count on which Anderson was convicted.

**24.** Somewhat later, Anderson received a $5,000 check from Spiegel payable to the "Committee for Maryland Progress," a non-existent organization. Pointing out to Betsey Norton that the check should have been made out to DCCME, and explaining that he had already given his own check to DCCME, Anderson arranged for her to cash the Spiegel check for him. She did so, signing her name as "Shipley," and delivered the cash to Anderson.

**25.** This transaction furnished the basis for the third count on which Anderson was convicted.

**26.** This was the witness' name at the time of trial. Until her remarriage in September, 1967, her surname, by virtue of an earlier marriage, was Fidler. Shipley was her maiden name.

**27.** Two days before the commencement of trial the prosecutor learned, for the first time, that Ms. Norton knew a great deal more about payments by Anderson and Spiegel than she had previously disclosed in testimony before the grand jury. This the prosecutor promptly made known to defense counsel and the court. In order that Ms. Norton's testimony might be compelled, she was granted immunity from prosecution, but thereafter she nonetheless moved to quash the subpoena outstanding for her attendance as a witness. The trial judge, after full hearing, found that the prosecutor had committed no impropriety in obtaining additional information from her, and ruled that her testimony would be admitted. But though sheathed with immunity, Ms. Norton was still recalcitrant; on direct examination, she suddenly announced that she would not testify further. An admonition by the judge out of the jury's presence did not help, and the judge finally adjudged her in contempt. After overnight incarceration and consultation with her attorney, Ms. Norton recanted and, over objection by the defense, was permitted to resume her testimony. She later explained to the jury that she had been motivated by a desire to protect Anderson, who had always treated her well.

**28.** See note 27, supra.

**29.** See note 27, supra, and Parts III(A), (B), (C), infra.

**30.** See notes 21, 24, supra, and accompanying text.

marked for Brewster.[31] For her cooperation she was rewarded in 1968 when Anderson importuned Modie Spiegel to arrange a mortgage on her home.

Anderson, Ms. Norton avowed, canvassed the members of the Senate Committee on Post Office and Civil Service in 1967 to ascertain their views on the pending rate-increase legislation. There was also a discussion between Anderson and Modie Spiegel in her presence regarding the response by Brewster, himself a committee member. Brewster had indicated a position favoring low-level third-class postal rates, and had already received $5,000 from Spiegel. Anderson felt, however, that additional payments were needed to insure his continued support.

Ms. Norton remarried[32] and moved to New York in September, 1967, but she often returned to Washington, and she continued to see Anderson through the fall of 1968. When the grand jury investigation in the instant case got under way, Anderson told her that she probably would be called as a witness, and reviewed with her the substance of the testimony she should give. Anderson also requested her to name John Criswell, then treasurer of the Democratic National Committee, to convey the impression that

. . . Mr. Criswell was a part of this so it would look like it was part of the Democratic National Committee rather than just a direct thing from Spiegel to Anderson to whomever the monies went for.[33]

To this end, Anderson arranged for Ms. Norton to meet Criswell in order to assure her ability to identify him if asked to do so by the grand jury. She flew from Washington to Kansas City for that purpose, observed Criswell at an airport there for five minutes, and returned to Washington later on the same day. This testimony was to become an important point in Anderson's argument for reversal of his conviction.[34]

## C. The Defense

Anderson took the witness stand in his own behalf.[35] He described for the jury the role of a congressional lobbyist, and acknowledged an introduction to Brewster and the campaign contribution to him in January, 1966.[36] At the behest of Brewster's late-1965 visitor,[37] Anderson said, he solicited the $5,000 check from the Bartenders Union and at Sullivan's direction had it made out to DCCME.[38]

Anderson denied any meeting with Brewster or Sullivan in January, 1967,[39] or any discussion attended by Morris Spiegel in April of that year.[40] He admitted, however, an April meeting with Brewster on behalf of the Spiegel company,[41] and claimed that the cash then given to Sullivan was his own contribution—and not one by Spiegel—in the amount of $7,500, not $4,500 as stated by Sullivan.[42] Anderson also admitted that

---

31. See notes 21, 24, supra, and accompanying text.

32. See note 26, supra.

33. In an effort to impeach Ms. Norton in this regard the defense exposed her grand jury testimony that Anderson and Criswell told her to cash the $13,500 check and deliver the proceeds to either or both of them. At trial, Ms. Norton maintained that she gave the money to Anderson alone.

34. See Part III(C), infra.

35. In some respects, Anderson's testimony was corroborated by Brewster. The evidence as to Brewster is summarized in our recent

opinion in his case. United States v. Brewster, supra note 7.

36. See text supra at notes 16–18.

37. See text supra at notes 14, 15.

38. See note 16, supra, and accompanying text.

39. See text supra at notes 19–20. His claim that he made no contribution to Brewster during that month is specifically corroborated by the latter's testimony.

40. See text supra at notes 22–23. Brewster's testimony tends to corroborate on this point.

41. See text supra at note 23.

42. While, at trial, Anderson said the $7,500 was turned over at a luncheon, a letter An-

in July, 1967, he delivered to Sullivan his personal check for $5,000, on which Sullivan then entered DCCME as payee,[43] because Sullivan had called him and urgently requested money.[44]

Anderson further testified that he was given the $13,500 Spiegel check,[45] but that he never contemplated its use for Brewster or DCCME. The check was drawn in favor of DCCME, Anderson said, simply as a means of enabling conversion of the check to cash. Then, Anderson continued, he turned the $13,500 over to John Criswell in cash, as part of approximately $50,000 which Anderson had pledged to raise for the Democratic National Committee.[46]

Anderson also undertook to explain to the jury the part Ms. Norton played in the affair.[47] By his arrangement, she cashed the $13,500 check to DCCME[48] and the $5,000 check to the D.C. Committee for Maryland Progress.[49] Those checks, Anderson said, were funneled through DCCME and cashed by Ms. Norton to avoid any appearance, from his own endorsement thereon, that the monies represented taxable income to him.[50]

Anderson also leveled an attack on Betsey Norton's credibility,[51] and not the least her claim that she met Criswell in Kansas City.[52] Anderson stated that he went to Kansas City and at an airport there discussed with Criswell the grand jury's interest in Anderson's fundraising activities. Anderson testified further that Ms. Norton accompanied him on the trip, but declared that she never saw Criswell because, he said, "[s]he was back at the Muhlbach Hotel" at the time.[53] John Criswell also testified to the airport meeting, stating "[to] the very best of [his] knowledge" that Ms. Norton was not present.[54]

The evidentiary and argumentative presentations at trial covered a period of more than two weeks. The trial judge submitted the case against Anderson and

derson wrote to the United States Attorney after his grand jury appearance recited that the money was given to Brewster in his office. The contribution was made in cash, Anderson testified, conformably with long standing Capitol Hill custom. Brewster's testimony acknowledges receipt of $4,500 of the money, and suggested that the contribution was a personal one and that there was no ongoing discussion of postal legislation when the money was handed to him.

**43.** See text *supra* at notes 24–25.

**44.** Brewster testified similarly.

**45.** See note 21, *supra*, and accompanying text.

**46.** Criswell's testimony tended to support Anderson in this regard, though Criswell admitted that he had told the grand jury that Anderson raised about $40,000 in 1966–67. Anderson stated that his grand jury testimony that Criswell received the $13,500 check was a product of confusion on his part.

**47.** Anderson said that during 1967 he knew Ms. Norton only as Betsey Fidler, and was unaware of her maiden name "Shipley." See note 26, *supra*. Anderson was contradicted by three Spiegel checks for campaign committees with which Brewster had no connection, which bore Ms. Norton's endorsement in the name "Shipley."

**48.** See note 21, *supra*, and accompanying text.

**49.** See note 24, *supra*.

**50.** The Government, however produced three Spiegel checks drawn payable to campaign committees unrelated to Brewster, each of which checks bore Anderson's endorsement in some variation of his given name.

**51.** One prong of Anderson's attack was an allegedly false claim by Betsey Norton that she was pregnant with his child. Anderson stated that the claim was made shortly after her remarriage in 1967 and that thereupon he executed a written acknowledgement of paternity incorporating a guaranty of the child's support. In this respect Anderson was corroborated by two other witnesses. Four months later, Anderson said, Ms. Norton told him that she had miscarried and he gave her all copies of the acknowledgement, retaining no documentation for himself. At trial, Ms. Norton steadfastly denied any sexual intimacy with Anderson.

**52.** See text *supra* at notes 32–34.

**53.** We elaborate upon this in Part III(C), *infra*.

**54.** Previously, however, in a statement to the Federal Bureau of Investigation, Criswell had said that Anderson possibly was accompanied by a friend at the airport.

Brewster[55] to the jury on six counts—three counts of bribery against each.[56] The jury was instructed that the range of permissible verdicts on each of these counts was guilty of bribery, guilty of unlawfully accepting gratuities, or not guilty. The jury found Anderson guilty of bribery on all three counts against him, and Brewster of thrice receiving gratuities unlawfully.[57] Anderson's post-verdict motion for a new trial was denied,[58] a judgment of conviction was entered, terms of imprisonment and fines were imposed,[59] and Anderson appealed. We have heretofore entered our judgment affirming Anderson's conviction, noting that this opinion would follow.

## II. THE JURY

Anderson's trial was scheduled to begin on October 30, 1972, the last day of service scheduled for the District Court's complement of petit jurors for that month. To avoid difficulty for any juror from a relatively lengthy extension of the period of service, the trial judge addressed to the jurors a general inquiry designed to ascertain how many would be able to serve beyond the normal expiration of their term.[60] The jurors were told that a trial starting October 30 might require two weeks, and neither the case nor its subject matter was identified. A total of 68 of some 200 to 300 jurors answered affirmatively.

The judge then asked counsel whether there was any objection to calling 60 of those indicating continuing availability as the panel from which the jury for the trial would be chosen. Anderson's counsel stated that he would "abide by the majority vote of defense counsel" but simultaneously suggested that "it might be best to start with a new jury" the next day. There was additional discussion but no further objection,[61] and the judge proceeded in accordance with the plan he had indicated.

We are now confronted with Anderson's contention that the procedure by which the 60-member panel of prospective jurors was obtained deprived him of a trial jury representative of the community. The panel, he says, was composed of "volunteers" "who expressed their desire to serve"—"people who had no responsibilities which would be seriously impaired by their absence from their normal routines for a period of several weeks;" a jury so constituted, Anderson argues, "was not an adequate cross-section of the metropolitan community upon which to try the sophisticated issues of this major criminal case."[62]

To be sure, Anderson was entitled to trial by a jury selected from a body truly representative of the community.[63] However, his characterization of the composition of the jury panel utilized in this case is far from accurate. There is not the slightest hint that the October complement of jurors—from which came the 60-member panel, and ultimately the jury for his trial—was other than a fair

---

**55.** See note 7, *supra*.

**56.** See note 6, *supra*.

**57.** See United States v. Brewster, *supra* note 7.

**58.** See Parts III, IV, V, *infra*.

**59.** On each count Anderson was sentenced to imprisonment for six to eighteen months and to pay a fine of $10,000, the sentences to operate consecutively and cumulatively.

**60.** "In any two-year period, no person shall be required to . . . serve or attend court for prospective service as a petit juror for a total of more than thirty days . ..." 28 U.S.C. § 1866(e) (1970).

**61.** The Government argues that failure to appropriately raise an objection to the trial

judge's proposal forecloses consideration of an objection now. See, e. g., Fed.R.Crim.P. 51; Washington v. United States, 134 U.S. App.D.C. 223, 225, 414 F.2d 1119, 1121 (1969); Miller v. Avirom, 127 U.S.App.D.C. 367, 369, 384 F.2d 319, 321 (1967). In any event, as we conclude, Anderson's point is substantively deficient.

**62.** Brief for Appellant at 27.

**63.** 28 U.S.C. § 1863(b)(3) (1970); Thiel v. Southern Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Glasser v. United States, 315 U.S. 60, 85–86, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Ware v. United States, 123 U.S.App.D.C. 34, 37, 356 F.2d 787, 790 (1965), cert. denied, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673 (1966).

cross-section of residents of the District of Columbia. Neither the panel nor the trial jury became any the less so by reason of the technique the judge employed. To say, as Anderson does, that the trial jurors had no responsibilities in competition with jury service is to indulge in speculation in an area wherein proof is an indispensable prerequisite.[64] Moreover, jury service in this age involves almost inevitably some sacrifice of personal pursuits; without people willing to devote some of their time and energy, the jury system would grind to a halt. The traditional response of the populace to the call to this public duty belies the notion that those who respond have nothing else of importance to do.

Nor, by our understanding, was the trial judge's methodology in this case an appeal to the outgoing body of jurors for volunteers.[65] The effort, rather, was to avoid imposition of an unexpected burden upon jurors who could ill afford to continue beyond the period for which they had been summoned to serve. Certainly the judge would have been justified in excluding any of those in the 200-odd category who might individually have shown undue hardship, even during the term of regular service.[66] Here the endeavor was to eliminate the tedious process of examining one by one the obviously large group who would seek to be excused for that reason.

In separating those who could from those who could not afford to expand their service, the judge did not exclude anyone or any cognizable group.[67] The sole criterion he employed was ability to serve longer; the panel from which the jury was drawn was distinguished only by that quality. We think a trial judge's discretion in jury selection[68] is broad enough to encompass consideration of adverse consequences which might be suffered by jurors suddenly called to a duty prolonged materially beyond their original expectations.

## III. THE WITNESS NORTON

We next address a brace of arguments for reversal which center on the testimony and testimonial conduct of Betsey Norton. One relates to the trial judge's ruling that Ms. Norton would be admitted as a witness, and the judge's concomitant refusal of a continuance, after it became known that her testimony would be far more extensive than had been anticipated.[69] Another pertains to the denial of a motion for a mistrial after the judge had held Ms. Norton in contempt.[70] Still another asserts perjury in her testimony that she met and observed John Criswell at the airport in Kansas City.[71] We discuss these aspects of the appeal in turn.

### A. *The Surprise Element*

In lieu of formal pretrial discovery procedures, defense counsel utilized a series of discussions with Government counsel as the means of obtaining information. The results of these efforts were incorporated in a jointly prepared "memorandum of conferences," upon which the defense relied in preparing for trial. Betsey Norton's grand jury testimony had been limited to the cashing of

---

**64.** See Frazier v. United States, 335 U.S. 497, 503–504, 69 S.Ct. 201, 93 L.Ed. 187 (1948), and cases there cited.

**65.** See *id.* Jurors are not freed from service simply by expiration of the normal period of service. See note 60, *supra.*

**66.** Thiel v. Southern Pac. Co., *supra* note 64, 328 U.S. at 224, 66 S.Ct. 984; United States v. Kelly, 349 F.2d 720, 778–779 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); Grech v. Wainwright, 492 F.2d 747, 749 (5th Cir. 1974).

**67.** Compare Frazier v. United States, *supra* note 64, 335 U.S. at 504, 69 S.Ct. 201; Thiel v. Southern Pac. Co., *supra* note 64.

**68.** See, *e. g.,* Katz v. United States, 321 F.2d 7, 8–9 (1st Cir.), cert. denied, 375 U.S. 903, 84 S.Ct.. 193, 11 L.Ed.2d 144 (1963); United States v. Bowe, 360 F.2d 1, 9 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); Rabinowitz v. United States, 366 F.2d 34, 50 (5th Cir. 1966).

**69.** See note 27, *supra.*

**70.** See note 27, *supra.*

**71.** See text *supra* at notes 33–34.

DCCME checks under the name "Shipley" and transferring the proceeds to Anderson,[72] and seemingly counsel on neither side had reason to believe that she knew more. Accordingly, the parties' memorandum reflected the expectation that her participation in the trial would be small.[73]

On the Saturday preceding the opening of trial,[74] the prosecutor learned for the first time that Ms. Norton was more than a courier in check-cashing, and that she professed to know a good deal about payments by Spiegel through Anderson to Brewster. At that time she revealed to the prosecutor new information regarding her involvement with Anderson, Spiegel and Criswell in the transfer of funds to Brewster and others. She indicated that her failure to divulge the information sooner stemmed from fear of prosecution, and of banishment from employment for betrayal of a confidence.

Armed with this knowledge, the prosecutor alerted defense counsel on Sunday that he had additional evidence to strengthen the Government's case.[75] On Monday morning one hour prior to commencement of trial, the prosecutor conferred with defense counsel and summarized for them Ms. Norton's amplifications. As soon as a jury was selected, defense counsel moved for a ruling excluding Ms. Norton as a trial witness and, alternatively, invoking Federal Criminal Rule 16(g),[76] also moved for a continuance. The trial judge denied these motions.

Anderson does not seriously contest the judge's finding that the Government came by the new information on the eve of trial and proceeded in good faith to promptly pass it on to his counsel.[77] Rather, Anderson contends that the judge should have dismissed Ms. Norton as a trial witness, or should at least have granted a continuance to provide an opportunity for them to meet her "surprise" testimony. Anderson advances no reason for a complete ban on Ms. Norton's testimony, the relevance and materiality of which is apparent, save that he needed time to combat it. Anderson's protest thus boils down to the position that the trial judge erred in disallowing the continuance.

▮▮ Indubitably, a reasonable time for adequate preparation of the accused's defense is the first essential of trial fairness,[78] and "a myopic insistence upon

---

72. See text *supra* at notes 21, 30 and notes 21, 24, *supra*.

73. As to Ms. Norton, the memorandum provided merely:

> The government expects to show that Anderson sought reimbursement from Spiegel for the $5,000 and it came in the form of a $5,000 check from Spiegel dated July 31, 1967 payable to the D.C. Committee for Maryland Progress. This check bears the endorsement of Betsey Shipley who will testify that she cashed the check and turned over the $5,000 cash to Anderson. . . . In addition, the government expects to show that when Betsey Shipley cashed the . . . check, Margaret Murphy was at the bank vouching for her.

74. The date was October 28, 1972. Trial was scheduled to begin on the following Monday, October 30.

75. Fed.R.Crim.P. 16(g), which was not strictly applicable to the situation, provides:

> If, subsequent to compliance with an order issued pursuant to this rule, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under the rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances.

76. See note 75, *supra*.

77. Compare United States v. Bryant, 142 U.S. App.D.C. 132, 141, 439 F.2d 642, 651 (1971).

78. Ungar v. Sarafite, 376 U.S. 575, 588–591, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Avery v. Alabama, 308 U.S. 444, 446, 453, 60 S.Ct. 321,

expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." [79] Refusal of a continuance to enable rebuttal of surprise prosecution testimony may produce these very consequences.[80] But "it is not every denial of a request for more time that violates due process," [81] nor does "the fact, standing alone, that a continuance has been denied, . . . constitute a denial of the constitutional right to assistance of counsel," [82] for "[t]he matter of continuance is traditionally within the discretion of the trial judge . . . ." [83] As the Supreme Court instructs, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." [84]

To Anderson's plea for additional time, the trial judge responded, quite correctly, that the Government was not obligated to disclose every item of Ms. Norton's expected testimony even had it been known earlier what the content of that testimony would be. The amplifications in her testimony were not exculpatory of Anderson,[85] and they did not fall within the categories of information which Rule 16(g) makes discoverable.[86] Beyond those considerations, the question before the trial judge was whether admission of Ms. Norton's tardy revelations into evidence might have so affected the defensive ability of Anderson's counsel as to necessitate a continuance to enable additional preparation.[87] The judge, after a full hearing on that subject, thought not, and while the judgment is ultimately ours,[88] we must accord deference to the judge's informed discretion.[89]

84 L.Ed. 377 (1940); United States v. Helwig, 159 F.2d 616, 618 (3d Cir. 1947); United States v. Millican, 414 F.2d 811, 814 (5th Cir. 1969); United States v. Ploeger, 428 F.2d 1204, 1205–1206 (6th Cir. 1970).

**79.** Ungar v. Sarafite, *supra* note 78, 376 U.S. at 589, 84 S.Ct. at 849.

**80.** See Hergenrother v. State, 215 Ind. 89, 18 N.E.2d 784, 788 (1939). Compare Lisenba v. California, 314 U.S. 219, 228, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

**81.** Ungar v. Sarafite, *supra* note 78, 376 U.S. at 589, 84 S.Ct. at 849. See also Avery v. Alabama, *supra* note 78, 308 U.S. at 446, 60 S.Ct. 321.

**82.** Avery v. Alabama, *supra* note 78, 308 U.S. at 446, 60 S.Ct. at 322.

**83.** Ungar v. Sarafite, *supra* note 78, 376 U.S. at 589, 84 S.Ct. at 849. See also Mahoney v. United States, 137 U.S.App.D.C. 3, 5, 420 F.2d 253, 255 (1969). Similarly, an application for relief under Fed.R.Crim.P. 16(g) is a matter committed to the sound discretion of the trial court. *E. g.,* Gevinson v. United States, 358 F.2d 761, 766 (5th Cir.), cert. denied, 385 U.S. 823, 87 S.Ct. 51, 17 L.Ed.2d 60 (1966).

**84.** Ungar v. Sarafite, *supra* note 78, 376 U.S. at 589, 84 S.Ct. at 850. See also Nilva v. United States, 352 U.S. 385, 395, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); United States v. Ray, 351 F.2d 554, 555 (4th Cir. 1965); Stamps v. United States, 387 F.2d 993, 995 (8th Cir. 1967); Eubanks v. United States, 336 F.2d 269, 270 (9th Cir. 1964).

**85.** See Brady v. Maryland, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See also Moore v. Illinois, 408 U.S. 786, 795–797, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Giglio v. United States, 405 U.S. 150, 153–154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Giles v. Maryland, 386 U.S. 66, 74, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 31–32, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162–163, 363 F.2d 287, 291–292 (1966).

**86.** Fed.R.Crim.P. 16 limits compellable discovery to the defendant's written or recorded statements and confessions, the results of physical or mental examinations and scientific tests, the defendant's testimony before a grand jury, and books, papers, documents, tangible objects or places material to the preparation of his defense.

**87.** See text *supra* at notes 78–84.

**88.** See Avery v. Alabama, *supra* note 78, 308 U.S. at 447, 60 S.Ct. 321; Pierre v. Louisiana, 306 U.S. 354, 358, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Norris v. Alabama, 294 U.S. 587, 590, 55 S.Ct. 579, 79 L.Ed. 1074 (1935).

**89.** United States v. Millican, *supra* note 78, 414 F.2d at 813; United States v. Mathison, 239 F.2d 358, 361 (7th Cir. 1956); Torres v. United States, 270 F.2d 252, 255 (9th Cir. 1959), cert. denied, 362 U.S. 921, 80 S.Ct. 675, 4 L.Ed.2d 741 (1960); Holt v. United States, 267 F.2d 497, 498–499 (8th Cir. 1959).

We perceive no cause to upset his judgment in the matter. We can no more in retrospect see prejudice to Anderson than the judge was able to anticipate prospectively.[90] Anderson's counsel were already on notice, from the memorandum of conferences and the conversations preceding it, that the Government would undertake to prove the events to which Ms. Norton was to testify. A whole week passed between the prosecutor's disclosure of Ms. Norton's newly-found knowledge to defense counsel and the time at which she took the witness stand. Just why that did not afford the opportunity Anderson's counsel asked for is not explained. Indeed, defense witnesses, including Anderson himself, testified in explicit detail in the effort to contradict Ms. Norton's description of disputed events and, more fundamentally, to destroy her basic credibility before the jury. In sum, the able and vigorous defense Anderson's counsel erected against Ms. Norton's "new" testimony belies any thought that Anderson was in any way harmed by the trial judge's ruling.[91]

## B. The Contempt Element

The prosecutor admittedly had been advised by Ms. Norton's personal counsel that she would decline to answer questions going beyond the scope of her grand jury testimony. Anderson asserts that after that declaration the calling of Ms. Norton as a witness was improper and prejudicial, and that the trial judge erred in denying his motion for a mistrial on that account. We do not agree.

■ The present situation is quite unlike that in cases, cited by Anderson, wherein the prosecutor called a witness in full awareness that the witness would invoke his privilege against self-incrimination.[92] Here the prosecutor had brought to the trial judge's attention Ms. Norton's unwillingness to testify voluntarily, and had sought and obtained for her a grant of immunity from prosecution. Thereafter, the prosecutor had every right to demand and to expect her testimony, under compulsion by the court if necessary, despite her preference to the contrary.[93]

■ We perceive no impropriety in the handling of the problem by either the prosecutor or the judge, and no ground for overturning the ruling on Anderson's ensuing motion. Declaration of a mistrial in a criminal case is a step to be avoided whenever possible,[94] and one to be taken only in circumstances manifesting a necessity therefor.[95] Re-

**90.** See United States v. Bentvena, 319 F.2d 916, 935 (2d Cir.), cert. denied, [Ormento v. United States, Di Pietro v. United States, Fernandez v. United States, Panico v. United States, Galente v. United States, Loicano v. United States, Mancino v. United States, Sciremammano v. United States, Mirra v. United States, 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963), rehearing denied, Fernandez v. United States, 375 U.S. 989, 84 S.Ct. 515, 11 L.Ed.2d 476 and Galante v. United States, 377 U.S. 913, 84 S.Ct. 1162, 12 L.Ed.2d 183 (1964)]; Gardiner v. United States, 321 F.2d 159, 161 (5th Cir.), cert. denied, 375 U.S. 953, 84 S.Ct. 445, 11 L.Ed.2d 314 (1963); United States v. Simpson, 460 F.2d 1321, 1322 (5th Cir. 1972).

**91.** We are advertent to the fact that Anderson's counsel did not come by the hotel bill, which was utilized as newly discovered evidence to underpin his motion for a new trial, until after the verdict was rendered. However, as we subsequently hold, that evidenti-

ary item could hardly have affected the verdict. See Part III(C), infra.

**92.** See Namet v. United States, 373 U.S. 179, 185–186, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); Fletcher v. United States, 118 U.S.App.D.C. 137, 138, 332 F.2d 724, 725 (1964); Sanders v. United States, 373 F.2d 735 (9th Cir. 1967).

**93.** See Piemonte v. United States, 367 U.S. 556, 559 n.2, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961); Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); In re Flanagan, 121 U.S.App.D.C. 368, 369, 350 F.2d 746, 747 (1965).

**94.** See United States v. Jorn, 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). Cf. Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

**95.** Brock v. North Carolina, 344 U.S. 424, 427, 73 S.Ct. 349, 97 L.Ed. 456 (1953); Wade v. Hunter, 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949); United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

luctance of a prosecution witness is not such an occasion;[96] rather, the court's duty is to secure the witness' testimony if compellable, and to give appropriate curative instructions to the jury, if necessary, to restore order in the trial.[97]

■ In the case at bar, the trial judge, out of the jury's presence, warned Ms. Norton of the consequences of the course she was taking, and adjudged her in contempt when she persisted. The judge also instructed the jury not to draw any inference of any kind from Ms. Norton's recalcitrance, or speculate as to what Ms. Norton's additional testimony would have been. Those steps fulfilled the judge's responsibility during the period Ms. Norton remained adamant. When Ms. Norton later recanted and returned to the witness stand for questioning by all counsel, any threat to Anderson's Sixth Amendment rights to confrontation and cross-examination—on account of her pre-contempt testimony—was eliminated from the trial. We do not find Anderson any the worse off because of this experience, and there is no occasion for us to determine what disposition would have been called for had Ms. Norton remained steadfast in her decision to say no more.

## C. The "Perjury" Element

The remaining prong of Anderson's attack on Betsey Norton's testimony is that it was tainted by perjury, a position Anderson derives from the following circumstances. Ms. Norton told the jury that Anderson arranged for her to travel to Kansas City to meet John Criswell so that she could identify him if asked to do so by the grand jury.[98] She further stated that she flew to Kansas City, observed him at an airport for a few minutes, and returned to Washington on the same day.[99] Anderson testified, however, that Ms. Norton was at the Muhlbach Hotel in Kansas City when he met Criswell at the airport,[100] and Criswell said that to the best of his recollection Anderson was alone at the time.[101]

After the trial had ended, Anderson's counsel came into possession of a receipted bill indicating that Ms. Norton was a guest of the Muhlbach Hotel for the night preceding the day of the airport meeting. On the basis of this discovery, and within the period extended by the trial judge for the purpose, counsel moved for a new trial.[102] The judge denied the motion, and his action in doing so is assigned as error. The argument is that Ms. Norton's version of her part in the Kansas City incident was a deliberate falsehood vitiating the verdict of Anderson's guilt.

■ The knowing use of perjured testimony to secure a conviction is a denial of due process of law,[103] necessitating, of course, a new trial.[104] This is not to suggest that a new trial is in order only upon an occurrence of constitutional

**96.** Frazier v. Cupp, 394 U.S. 731, 735–736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

**97.** Frazier v. Cupp, *supra* note 96, 394 U.S. at 735–736, 89 S.Ct. 1420; Carsey v. United States, 129 U.S.App.D.C. 205, 207, 392 F.2d 810, 812 (1967).

**98.** See text *supra* at notes 33–34.

**99.** See text *supra* at note 34.

**100.** See text *supra* at note 53.

**101.** See text *supra* at note 54.

**102.** "The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period." Fed.R.Crim.P. 33.

**103.** Moore v. Illinois, *supra* note 85, 408 U.S. at 797–798, 92 S.Ct. 2562, 33 L.Ed.2d 706; Giglio v. United States, *supra* note 85, 405 U.S. at 153–154, 92 S.Ct. 763, 31 L.Ed.2d 104; Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Napue v. Illinois, *supra* note 85, 360 U.S. at 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217; Alcorta v. Texas, *supra* note 85, 355 U.S. at 31–32, 78 S.Ct. 103, 2 L.Ed.2d 9; Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

**104.** See cases cited *supra* note 103.

dimension. There is respectable authority for the proposition that a new-trial motion on the ground of false testimony, even without a claim that the prosecutor knew of the falsity, should under some conditions be granted.[105] Moreover, a new-trial motion based on newly discovered evidence made within the seven-day period following verdict—which in federal practice is allowed for such a motion irrespective of its grounds [106]—or, as here, within an extension of that period, is to be measured in terms of "the interest of justice," [107] and not by the stricter standard applicable to motions submitted outside that time frame.[108] With these principles in mind, we examine the situation before us.

 The two critical events—an overnight stay at a Kansas City hotel . and a brief meeting with Criswell at a Kansas City airport the next day—are not inherently inconsistent; put another way, it was easily possible for Ms. Norton to have engaged in each. It follows that the hotel bill had no overpowering tendency to prove that Ms. Norton did not see Criswell at the airport just as she said.[109]

We are mindful of Ms. Norton's statement that she flew to Kansas City, met Criswell and returned to Washington on the same day. But the mere fact that witnesses give different testimony—and that is all we have here—is obviously insufficient to establish that either is a perjurer. That is the more so where, as here, almost two years elapsed between the airport episode and the testimony at Anderson's trial. Furthermore, as a constitutional claim Anderson's complaint fails additionally for the reason that there is not the slightest indication that the prosecutor knew that Ms. Norton testified falsely, if indeed she did.[110]

 We come, then, to the question whether, as a nonconstitutional matter, the unavailability of the hotel bill at trial called so imperatively for a grant of Anderson's motion "in the interest of justice" that the trial judge's conclusion on that score should be overturned.[111]

---

**105.** It is said that three conditions must be satisfied before such a motion will be granted:

> (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it for it did not know of its falsity until after the trial.

Larrison v. United States, 24 F.2d 82, 87–88 (7th Cir. 1928) (emphasis in original). See also United States v. Lombardozzi, 343 F.2d 127, 128 (2d Cir.), cert. denied, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965); Newman v. United States, 238 F.2d 861, 862, n. 1 (5th Cir. 1956); Gordon v. United States, 178 F.2d 896, 900 (6th Cir. 1949), cert. denied, 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950).

**106.** See note 102, *supra*.

**107.** Brodie v. United States, 111 U.S.App.D.C. 170, 172–173, 295 F.2d 157, 159–160 (1961); Benton v. United States, 88 U.S.App.D.C. 158, 160, 188 F.2d 625, 627 (1951); United States v. Schartner, 285 F.Supp. 193, 196 (E.D.Pa. 1967).

**108.** See , e. g., Thompson v. United States, 88 U.S.App.D.C. 235, 236, 188 F.2d 652, 653 (1951), where we stated the requirements for such cases as follows:

> To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

**109.** Compare Moore v. Illinois, *supra* note 85, 408 U.S. at 798, 92 S.Ct. 2562. The hotel bill indicates a check-out time at about 8:30 a.m. The alleged meeting with Criswell at the airport supposedly occurred no earlier than 10:00 a.m. on that day.

**110.** See text *supra* at note 103. Nor do we believe that the airport identification which Ms. Norton related, even if proven false, bore such significance to Anderson's bribery trial as a whole that it "could . . . in any reasonable likelihood have affected the judgment of the jury . . ." Giglio v. United States, *supra* note 85, 405 U.S. at 154, 92 S.Ct. at 766, quoting Napue v. Illinois, *supra* note 85, 360 U.S. at 271, 79 S.Ct. 1173.

**111.** See text *supra* at notes 106–108.

We answer that question in the negative. Failing as an instance of perjury, the inconsistencies to which Anderson adverts could only impinge upon Ms. Norton's credibility as a witness.[112] A review of the trial record discloses, however, that even without the hotel bill Anderson was able to mount a substantial challenge to her veracity. The jury knew that she was a reluctant and ambivalent witness, and that her grand jury presentation was much less expansive than her statement at trial; the jury saw the clash of her version with a considerable volume of testimony by other witnesses. Demonstration of an additional inconsistency, particularly one of such relatively small stature as the airport story, would not likely have changed the jury's verdict. By the same token, only dubiously could a new trial for Anderson have served the interest of justice.

■ It is well settled that disposition of a motion for a new trial rests within the sound discretion of the trial judge, and should be disturbed only for abuse or misapplication of the law.[113] The circumstances here do not persuade us that the able trial judge was misguided in his conclusion as to the direction in which the interest of justice lay. We accordingly sustain his ruling.

## IV. THE TRIAL EVENTS

We next examine three events occurring at Anderson's trial, which assertedly require reversal of his conviction. One was a reference by a Government witness to an act of bribery attempted by Anderson some years prior to trial. Another was the trial judge's refusal to give to the jury two instructions requested by Anderson's counsel. The third was an unsuccessful challenge to the legal sufficiency of the evidence to support Anderson's conviction of bribery. We find none of these contentions a basis for upsetting the conviction.

### A. The Bribery Reference

John Sullivan testified that when Brewster's January, 1966, visitor said that she could get campaign funds from Anderson, Brewster suggested that Anderson contact Sullivan in that regard. Somewhat surprised by Brewster's reply, Sullivan continued, after the visitor's departure he inquired of Brewster about it. Sullivan then testified that Brewster responded, "I know Cy Anderson and back when I was a Congressman he tried to bribe me and I threw him out of my office."

On objection by Spiegel's counsel, the trial judge immediately instructed the jury to limit consideration of that statement to Brewster's fate alone. Anderson now contends that the statement was an impermissible hearsay reference to another crime—a reference which he could not explore by examination of Brewster,[114] and which the judge's limiting instruction could not completely meet. We do not find in these arguments a basis for reversal.

■ As we have had past occasion to admonish, "evidence indicating the accused's commission of an offense not on trial, because of its potential for prejudice, is generally to be excluded."[115] We have consistently recognized, however, that this rule is subject to exceptions[116]

---

112. The record before us does not present a *Brady*-type question. See note 85, *supra*, and accompanying text. While it clearly appears that Anderson learned of the hotel bill only after the conclusion of trial, the record makes plain that the Government did not become aware of it until it was tendered in support of the new-trial motion.

113. United States v. Johnson, 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Gaither, 142 U.S.App.D.C. 234, 236, 440 F.2d 262, 264 (1971); Smith v. United States, 124 U.S.App.D.C. 57, 58, 361 F.2d 74,

75 (1966); Calomeris v. United States, 95 U.S. App.D.C. 239, 240, 221 F.2d 111, 112 (1955).

114. Brewster, Anderson's codefendant, had not then taken the witness stand to testify, or otherwise waived his constitutional privilege against self-incrimination.

115. Robinson v. United States, 148 U.S.App. D.C. 58, 67, 459 F.2d 847, 856 (1972), and see cases there cited.

116. Drew v. United States, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964); Fairbanks v. United States, 96 U.S.App.D.C. 345, 347, 226 F.2d 251, 253 (1955).

which may come into operation when the probative value of the evidence outweighs its potentially harmful effect.[117] A situation possibly justifying invocation of an exception arises when other-crimes evidence tends to prove an intent which is an essential element of the offense on trial.[118]

 Proof of the offense of bribery involves proof, among other things, of corrupt intent to influence or be influenced in official conduct.[119] The statement in question tended to show Brewster's prior knowledge of Anderson and Brewster's state of mind in accepting money from Anderson. So, upon a balance of that value against possible injury, the trial judge might properly have admitted the statement for the jury's consideration in connection with the bribery charges then pending against Brewster.

██ The greater concern, however, is not the admissibility of the statement against Brewster, but the effect of such admission upon Anderson, and in that regard Anderson lodges three complaints. One is that the statement, as to Anderson, was hearsay, and with that premise we readily agree. But the statement, as a purported admission by Brewster, was not hearsay as to him, and the trial judge instructed the jury to confine to Brewster alone any use it might make of the statement. Another complaint registered by Anderson is that since, at the time of admission of the statement, Brewster could not have been examined by Anderson,[120] he was deprived of his constitutional right of confrontation.[121] That difficulty disap-

peared, however, when later in the trial Brewster took the witness stand himself and denied that he ever made the statement.[122] Anderson's remaining complaint is that the trial judge's limiting instruction did not give him adequate protection. We think the jury's willingness to heed instructions and its ability to keep separate the evidence against Brewster and Anderson, respectively, is amply shown by the discriminating verdicts it rendered.[123]

## B. The Requested Instructions

At trial, Anderson's counsel requested, and the judge refused, two instructions which assertedly were essential to the jury's understanding of the theory of his defense. One would have told the jury that

[i]t is not corrupt in itself to influence or to attempt to influence a Senator or other legislator, nor is it corrupt in itself for a Senator to be influenced in respect to his actions, vote or decision on legislation. It is a part of the duty of every Senator to pay heed to and consider the views of all responsible parties on any matter of legislation before him.

The other request would have said that

[a] lobbyist is a person who is paid for the purpose of attempting to influence the passage or defeat of legislation by the Congress of the United States. This is neither illegal nor improper. The only legal restriction on a lobbyist is that he or she must be properly registered with the Clerk of the House of Representatives or the Secretary of

---

117. Robinson v. United States, *supra* note 115, 148 U.S.App.D.C. at 67–68, 459 F.2d at 856–857; Bradley v. United States, 140 U.S. App.D.C. 7, 12, 433 F.2d 1113, 1118 (1969).

118. *E. g.,* United States v. Fench, 152 U.S. App.D.C. 325, 331, 470 F.2d 1234, 1240 (1972), cert. denied, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); Drew v. United States, *supra* note 116, 118 U.S.App.D.C. at 16, 331 F.2d at 90. See generally, C. McCormick, Evidence § 190 (2d ed. 1972); 2 J. Wigmore, Evidence §§ 300–373 (3d ed. 1940).

119. See note 1, *supra,* and 18 U.S.C. § 201(c) (1970).

120. See note 114, *supra.*

121. See Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

122. Nelson v. O'Neil, 402 U.S. 622, 629–630, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); Jackson v. United States, 142 U.S.App.D.C. 19, 20, 439 F.2d 529, 530 (1970).

123. Compare notes 6 and 9, *supra.*

the Senate. In this case Mr. Anderson was so registered.

We think the judge properly rejected both.

■ We have no problem with the portion of the first request which spoke to the obligation of legislators to consider responsible views on pending legislation. But we cannot subscribe to an instruction indicating that influencing or attempting to influence a legislator in the performance of an official act cannot amount to bribery. A gift or promise of something of value with intent to exert such an influence *is* bribery;[124] the influencing is legally innocent only if unaccompanied by that factor. If Anderson's first request incorporated that qualification, it did so all too subtly,[125] and unless the qualification was clear the instruction asked for was misleading.

■ The second instruction Anderson sought suffers from a similar infirmity. While we do not quarrel with the accuracy as distinguished from the relevance of Anderson's general definition of a lobbyist, we encounter difficulty with the statement that "[t]he only legal restriction on a lobbyist is" proper registration. It may be that registration is the only precondition to lobbying, but a lobbyist is nonetheless under the same legal restrictions imposed by the bribery laws upon everybody else; in a word, that one who violates those laws is a lobbyist is no defense. Anderson's second request, like the first, could have misled the jury, and the trial judge rightly declined to give it. Certainly the profession of lobbying is honorable; just as surely influence devoid of unlawful means is innocuous, but Anderson's instructions implied much more.

We are advertent to the consideration that, as Anderson argues, an accused is entitled to instructions addressed to his theory of the case when properly requested and framed.[126] But here the function of the lobbyist was thoroughly ventilated before the jury by Anderson's testimony, and the instructions the trial judge gave the jury adequately explained the requirement of corrupt intent—the element toward which Anderson directed his main defense—even to the extent of exonerating campaign contributions inspired by the recipient's general position of support on particular legislation. In this fashion the jury was informed of Anderson's occupational and operational background, and the judge's instructions furnished the jury with sufficient guidance to enable the distinction of lawful contributions from bribes. These circumstances considered, Anderson is not in position to urge that the judge should have done more.

## C. The Sufficiency of the Evidence

■ Anderson also questions the legal sufficiency of the Government's evidence to support his conviction on the three bribery charges. He contends, as he did on his motion for a new trial, that the Government failed to prove the specific intent prerequisite to a bribery conviction. He asserts that the evidence did no more than portray an active lobbyist who contributed funds for the reelection campaign of a financially hard-pressed legislator, both before and during an effort to assist him in the presentation of a position which he had long espoused publicly as well as in the legislature. Anderson also suggests that the Government showed at most the payment of unlawful gratuities and not bribery. We find these arguments unacceptable.

Certainly, to establish one of the elements of bribery, the Government had to prove that Anderson, directly or indirect-

---

**124.** See note 1, *supra*. This is so even if the recipient is not actually influenced. See Part V(A), *infra*.

**125.** It may be that the words "in itself," appearing twice in the proposed instruction, were intended to qualify the broad proposition stated. The difficulty is that a layman could hardly be expected to fully grasp the significance of those words as a suitable qualification.

**126.** See United States v. Mack, 151 U.S.App. D.C. 162, 167, 466 F.2d 333, 338, cert. denied, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972); Brooke v. United States, 128 U.S.App. D.C. 19, 24, 385 F.2d 279, 284 (1967), and cases cited note 17 therein.

ly, corruptly gave, offered or promised something of value to Brewster, or promised Brewster that he would give something of value to some other person or entity, with intent to influence an official act.[127] We need not restate the extensive evidence introduced by the Government for that purpose—evidence we have already elaborately summarized.[128] For present purposes it suffices to note Anderson's employment by Spiegel and his duty as its lobbyist to protect its vital business interest in low third-class postal rates; Anderson's contacts, financial and otherwise, with Brewster, after a rate-increase proposal became known; the $5,000 check from the Bartenders Union, sent at Anderson's request to DCCME in January, 1966, in the understanding that Brewster would keep an "open mind" on the proposal; the $5,000 cash payment in January, 1967, during Anderson's presentation to Brewster of Spiegel's opposition to the proposal; the $4,500 cash payment in April, 1967, during a similar discussion; and the delivery in July, 1967, of Anderson's check for $5,000 with the payee blank, in lieu of the delayed Spiegel check in that amount, after Sullivan's call for another contribution. We also note that these payments were invariably associated with a communication, express or tacit, of interest in the rate-raise proposal, and in all but one instance were made from Spiegel funds.

It is not our function to retry the case, weigh the evidence, or pass on the credibility of the witnesses.[129] It is our duty to sustain the jury's verdict if there is substantial evidence, in the light most favorable to the Government, to support the jury's conclusion.[130] Here the evidence warranted the jury in finding, if so inclined, that Anderson, both directly and indirectly, gave Brewster monies originating from Spiegel with intent to influence Brewster's action on the postal-rate legislation. That intent could be derived from the nature of Anderson's communications with Brewster, from the professed interest of Anderson's client in Brewster's position, and from subterfuge—delivering two large cash payments—in negotiating two Spiegel checks, and in preparing Betsey Norton for the grand jury.[131] We hold that the evidence was legally sufficient to enable conviction.[132]

## V. THE POST–VERDICT EVENTS

There remain for consideration two additional arguments by Anderson. One is that his conviction of bribery is fatally inconsistent with Brewster's conviction of receiving unlawful gratuities. The other is that the imposition of consecutive sentences was legally erroneous. Like Anderson's other contentions on this appeal, we find these claims unavailing.

### A. *The Brewster Verdict*

While the jury found Anderson guilty of bribery, it acquitted Brewster of that offense and fixed his guilt instead at unlawful receipt of gratuities.[133] Anderson claims that these verdicts are fatally inconsistent, and that reversal of his conviction is accordingly required. He argues that the Government's evidence details such a course of conduct between

---

127. See note 1, *supra.*

128. See Parts I(A), (B), *supra.*

129. *E. g.,* Johnson v. United States, 138 U.S. App.D.C. 174, 178, 426 F.2d 651, 655 (*en banc* 1970), petition for cert. dismissed, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971).

130. Glasser v. United States, *supra* note 63, 315 U.S. at 80, 62 S.Ct. 457, 86 L.Ed. 680; Crawford v. United States, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

131. See, *e. g.,* United States v. Egenberg, 441 F.2d 441, 443 (2d Cir.), cert. denied, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971); United States v. DeAlesandro, 361 F.2d 694, 699 (2d Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966).

132. Compare Nye & Nissen, Inc. v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Lumpkin, 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971); Long v. United States, 124 U.S. App.D.C. 14, 20, 360 F.2d 829, 835 (1966).

133. United States v. Brewster, *supra* note 7, 165 U.S.App.D.C. at 5, 506 F.2d at 66.

Brewster and himself that no distinction between their acts or intent could rationally be drawn. He reasons that in the presence of such factual similarity the jury erred in finding that he corruptly intended to give money to Brewster to influence his official action, but that Brewster lacked a corresponding intent in the receipt of such monies.

 We note initially that inconsistent verdicts are not self-vitiating.[134] Beyond that, the verdicts as to Anderson and Brewster, respectively, are not per se inconsistent. The payment and the receipt of a bribe are not interdependent offenses,[135] for obviously the donor's intent may differ completely from the donee's. Thus the donor may be convicted of giving a bribe despite the fact that the recipient had no intention of altering his official activities, or even lacked the power to do so.[136]

As ever so recently we recognized, these mental elements are the factors differentiating the offense of bribery from the lesser offense of unlawfully receiving gratuities.[137] Here, on the evidence, the jury could reasonably conclude that Anderson gave Brewster monies with corrupt intent to influence his vote on the proposed rate-increase legislation, and that Brewster, though insensitive to any influence, accepted the mo-

nies with knowledge that Anderson's purpose was to reward him for his stance on such legislation.

## B. *The Sentences*

The trial judge imposed separate sentences on each of the three counts upon which Anderson was convicted, and expressly directed that the terms of imprisonment and fines operate consecutively and cumulatively.[138] The allegations of these counts were similar, differing only as to dates and amounts of alleged payments to Brewster. Anderson contends that at best the Government's evidence showed that his dealings with Brewster were all part and parcel of a single design—in his words, "three installments of the same transaction"[139]—with the result that consecutive sentences were improper. We disagree.

 The principles guiding our decision have been fully staked out. "[T]he statutes are first examined to ascertain if they will bear interpretation as creating separate offenses. If so the court then inquires whether Congress also intended 'to pyramid the penalties' . . . or only to establish a different degree or type of offense."[140] The solutions to these questions—the appropriate unit of prosecution and the appropriate mode of sentencing—are first to be sought in the intention of the legislature.[141] We think

---

**134.** United States v. Fox, 140 U.S.App.D.C. 129, 132, 433 F.2d 1235, 1238 (1970), and cases there cited.

**135.** United States v. Brewster, *supra* note 7, 165 U.S.App.D.C. at 10, 506 F.2d at 71; United States v. Michelson, 165 F.2d 732, 733 (2d Cir.), aff'd, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). See also Egan v. United States, 52 App.D.C. 384, 388, 287 F. 958, 962 (1923).

**136.** United States v. Hall, 245 F.2d 338, 339 (2d Cir. 1957); Wilson v. United States, 230 F.2d 521, 526 (4th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 789, 100 L.Ed. 1460 (1956); United States v. Troop, 235 F.2d 123, 124–125 (7th Cir. 1956).

**137.** United States v. Brewster, *supra* note 7, 165 U.S.App.D.C. at 10–12, 506 F.2d at 71–73.

**138.** See note 59, *supra.*

**139.** Brief for Appellant at 42.

**140.** Ingram v. United States, 122 U.S.App. D.C. 334, 335, 353 F.2d 872, 873 (1965), quoting Prince v. United States, 352 U.S. 322, 327, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957). See also cases cited *infra* notes 141, 149.

**141.** As to multiple convictions, see United States v. Maude, 156 U.S.App.D.C. 378, 393, 481 F.2d 1062, 1077 (1973); United States v. Alexander, 152 U.S.App.D.C. 371, 379, 471 F.2d 923, 931, cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972). As to consecutive sentences, see Heflin v. United States, 358 U.S. 415, 419–420, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); Ladner v. United States, 358 U.S. 169, 177–178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); Bell v. United States, 349 U.S. 81, 82–83, 75 S.Ct. 620, 99 L.Ed. 905 (1955). When the legislative will is obscure, other canons come into play. *E. g.,* Bell v. United States, *supra,* 349 U.S. at 84, 75 S.Ct. 620. We do not reach the latter in this case.

the legislative history of the bribery statute under which Anderson was convicted requires an affirmative answer to each of the questions.

■ The statute was enacted in 1962,[142] and in it Congress consolidated former bribery and unlawful-gratuity laws into one.[143] Concomitantly, in companion statutes, Congress extensively regulated payments to public officers and conflicts of interest.[144] The congressional objective was broad,[145] hardly less comprehensive than that inspiring forerunning legislation.[146] Very significantly, Congress specifically noted that enactment of the consolidated statute was not designed to narrow judicial interpretations of earlier bribery statutes, but rather to assure that the scope of those interpretations would be accorded universal application.[147] Under prior bribery laws consecutive sentences for payments individually made for the single

purpose of influencing the same person had been upheld.[148]

We think the same treatment is a permissible alternative under the present statute. Congress has decided that bribery and kindred practices imperil the very nature of democratic government. It has legislated a vigorous attack on those practices. The only intention we can reasonably ascribe to Congress is that bribers may be punished separately for separate acts of bribery.[149] We note, too, that courts construing other bribery laws have discarded the "installment" theory of bribery [150] in favor of the view that each bribe warrants a separate penalty.[151] We are persuaded to the same action here.

And so we conclude our review. Upon careful consideration of Anderson's contentions in light of the record, we have found no error. For the reasons stated herein, the judgment of his conviction has been affirmed.[152]

---

**142.** Act of Oct. 23, 1962, added Pub.L. No. 87–849, 76 Stat. 1119. In respects not material to this case, the statute was amended by Act of Sept. 22, 1970, Pub.L. No. 91–405, tit. II, § 204(d)(2), 84 Stat. 853.

**143.** See S.Rep. No. 2213, 87th Cong., 2d Sess. 7 (1962); H.R.Rep. No. 748, 87th Cong., 1st Sess. 6 (1961).

**144.** See 18 U.S.C. §§ 202–209 (1970).

**145.** "The proper operation of a democratic government requires that officials be independent and impartial; that Governmental decisions and policy be made in the proper channels of the governmental structure; that public office not be used for personal gain; and that the public have confidence in the integrity of its government." H.R.Rep. No. 748, 87th Cong., 1st Sess. 5–6 (1961).

**146.** See S.Rep. No. 2213, 87th Cong., 2d Sess. 5 (1962); H.R.Rep. No. 748, 87th Cong., 1st Sess. 3 (1961).

**147.** See S.Rep. No. 2213, 87 Cong., 2d Sess. 7 (1962); H.R.Rep. No. 748, 87th Cong., 1st Sess. 6 (1961).

**148.** Biddle v. Wilmot, 14 F.2d 505, 507 (8th Cir. 1926). See also Egan v. United States,

*supra* note 135, 52 App.D.C. at 388, 287 F. at 962; United States v. Michelson, *supra* note 135, 165 F.2d at 733; Patton v. United States, 42 F.2d 68, 69 (8th Cir. 1930).

**149.** Compare Gore v. United States, 357 U.S. 386, 391, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**150.** See text *supra* at note 139.

**151.** See United States v. Cohen, 384 F.2d 699, 700 (2d Cir. 1967); United States v. Alaimo, 297 F.2d 604, 606 (3d Cir. 1961), cert. denied, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962); United States v. Donovan, 339 F.2d 404, 410 (7th Cir.), cert. denied, 380 U.S. 975, 85 S.Ct. 1338, 14 L.Ed.2d 271 (1965). Cf. Badders v. United States, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916); Ebeling v. Morgan, 237 U.S. 625, 630, 35 S.Ct. 710, 59 L.Ed. 1151 (1915); United States v. Brown, 36 F.R.D. 207, 208 (D.D.C.1964).

**152.** See text *supra* following note 59.